STATE BOARD OF EXAMINERS IN LAW v. WILLIS E. DODGE and Another.[1]

August 5, 1904.

Nos. 13,995, 13,996—(213, 214).

**Misconduct of Attorneys—Evidence.**
> Evidence in proceedings to secure disbarment of attorneys for wilful misconduct as counselors at law reviewed, and rule to show cause discharged.

Order issued from the supreme court upon the accusation and petition of Eli Southworth, as secretary of the state board of examiners in law, requiring defendants Willis E. Dodge and Vernon M. Dodge, attorneys at law, to show cause, respectively, why they should not be disbarred for unprofessional conduct. Order discharged.

[1] Reported in 100 N. W. 684.

*Eli Southworth,* for prosecution.

*Henry C. Belden, William E. Hale,* and *Mortimer H. Boutelle,* for respondents.

PER CURIAM.

This proceeding was commenced against respondents, upon petition of the secretary of the state board of law examiners, to secure their disbarment for wilful misconduct as counselors at law.

The petition alleges that September 13, 1903, Mary Fitzgerald and Hugh Rankin were injured in a Great Northern Railroad wreck at Dassel, Minnesota, and that respondents were engaged as attorneys to prosecute their claims for damages for injuries received; that, owing to her physical condition and business inexperience, Mrs. Fitzgerald placed the entire control and management of her case in the hands of her brother, Thomas O'Brien, who resided in Minneapolis, and who, it is alleged, in consideration of obtaining the business for respondents, was promised by them twenty five per cent. of whatever fee might be received; that an action was commenced in the district court of Hennepin county to recover the sum of $20,000 damages, and thereupon negotiations were conducted between respondents and the railroad company, which on November 3, 1903, resulted in a settlement of the claim for $5,000; that thereafter, November 4, 1903, respondents informed Mrs. Fitzgerald and her brother Thomas O'Brien by letter that the company had offered $3,500 in settlement of the claim, which was the greatest amount it would pay, that limit having been fixed by the executive board; that the offer would be withdrawn unless accepted before four o'clock on that day; and that respondents preferred to take a $500 fee, and give Thomas O'Brien twenty five per cent. thereof, rather than take chances on the result of litigation. The petition alleges that, deceived by such representations, Mrs. Fitzgerald accepted the supposed offer by the railroad company of $3,500, and executed a power of attorney to respondent W. E. Dodge, authorizing him to make settlement of her claim; that the following day, November 5, respondents made a settlement with the company pursuant to the agreement of November 3, and received the sum of $5,000 in discharge of the claim, executed the acquittance papers, and dismissed the action; that respondents paid Mrs. Fitzgerald $3,000, representing to her that settlement had been

93 M.—11

made for $3,500, out of which they would retain $500 for their services,. less $125 paid to Thomas O'Brien. The petition then alleges that in fact respondents received and retained $2,000, $1,500 of which they fraudulently appropriated to their own use.

In the Rankin case it is alleged that respondents made an agreement for settlement with the company on November 3, 1903, for $1,000, and the next day represented to Rankin they had settled for $500—their fees to be $100, twenty five per cent. of which was to go to Thomas O'Brien; that they received $1,000, and paid Rankin $400, retaining $600, of which amount they fraudulently appropriated to their own use $500. Respondents answered orally, denying the accusations. The evidence was taken before a referee, and it has become the duty of this court to determine from the evidence thus returned whether the charges are sustained.

The defense is that October 17, 1903, Thomas O'Brien, representing Mrs. Fitzgerald, inquired of respondents what would be their fee in her case; that he was told the usual fee was forty to fifty per cent. of the amount recovered, and that a forty per cent. basis was agreed upon; that suit was commenced and negotiations conducted with that understanding; that the two cases now under consideration, and two others growing out of the same accident, also in the hands of respondents, were considered together, and the company refused to settle any one of them unless all were compromised; that respondents, on behalf of their clients, offered to accept $10,000 in settlement of the four claims, which was rejected by the company; that on November 3, at respondents' office, in Minneapolis, John R. Howard, the company's claim agent, made an offer of $6,000 in settlement of the four claims,. which was refused; that November 3 O'Brien expressed dissatisfaction with the amount likely to be received by his sister on the percentage basis, and proposed that a definite net amount be fixed upon, which he desired should be $5,000; that, upon being informed of the offer of $6,000, and that the Fitzgerald claim would be entitled to only $3,500 of that amount, he agreed to accept $3,000 net for his sister, and the letter, Exhibit 3, was written November 4, at O'Brien's suggestion, to set forth the facts to Mrs. Fitzgerald and her family, to show good faith on his part in making the settlement. Respondents further claim that it was understood by both O'Brien and Mrs. Fitzgerald that

they were to retain all they could secure over $3,000 for their fees and expenses, and that, after this agreement was entered into, Howard offered to raise the amount from $6,000 to $8,000 in settlement of the four cases, and that they finally compromised for the sum of $8,750.

As to the Rankin claim the defense is similar. Rankin was told that the usual fees were forty to fifty per cent. of the amount received, but in his case no definite agreement was made. November 4 Rankin stated that if he could get $400 he would be satisfied, as he wanted to get away, and it was agreed that he should receive that amount; it being understood that respondents were entitled to whatever they might obtain in excess thereof.

The evidence is voluminous and conflicting, but centers around two principal points contended for by the prosecution, and two which are relied upon by the defense, viz.: Upon the part of the state, that Howard had offered $8,000 in settlement of the four cases prior to the writing of the letter, Exhibit 3, and that it was written by respondents to Thomas O'Brien and Mrs. Fitzgerald for the purpose of inducing them to enter into a settlement for the sum of $3,500, respondents having already made an agreement with the company upon the basis of $5,000. Upon the part of the respondents, that October 17 they agreed with O'Brien to take the Fitzgerald case upon the basis of forty per cent. of the amount received, and that this contract was afterwards changed, whereby she was to receive $3,000 net, and respondents to retain whatever could be secured over that sum.

According to the testimony of Thomas O'Brien, respondents solicited the business, and, for his trouble in the matter, agreed to pay him twenty five per cent. of such fees as they might receive. In this connection, it should be noted that another brother, William O'Brien, was injured in the same wreck, and respondents were desirous also of securing control of his claim for damages. Thomas O'Brien stated that, in the course of several conversations prior to October 17, he asked respondents the amount of their fees, and that W. E. Dodge replied that in Mrs. Fitzgerald's case it would not be a great deal—a few hundred dollars for their fees and expenses of running around—and that no positive agreement as to the amount was ever made. O'Brien admits that he visited respondents' office, in Minneapolis, on October 17, for the purpose of consultation with reference to his sister's case, but

states that he arrived there in the early afternoon, and found no one in but Miss Le Beau, the stenographer, and that he had no interview with respondents. On the contrary, respondents, Miss Le Beau, and two other witnesses (A. A. Andrews and John R. Heino) testified they were in respondents' office on that day between twelve and one o'clock, and heard a conversation between respondents and O'Brien regarding compensation, and that it was agreed respondents should receive forty per cent.

O'Brien is corroborated as to time by the timekeeper of the American Bridge Company, where he worked, and the records kept, which show he was at work on that day until 12.30 o'clock. If he had gone directly from his work to respondents' office, he could have arrived there within the time fixed by respondents' witnesses; but O'Brien states that he walked twelve blocks to his home, washed up; and had his dinner before going to respondents' office. Respondents and their witnesses testify that they left the office about one o'clock, had their lunch, and then went to the football game.

Whether this contract was entered into upon the basis of forty per cent. is an important feature in this case, and has direct bearing upon the subsequent conduct of the parties. We get little assistance in determining this point from other sources than the testimony of the persons already mentioned. Upon the one hand, there was some reason for leaving the amount of their fees undetermined, if their object was to secure control of the William O'Brien claim, which was the most serious of all, and was afterwards settled for $7,500. On the other hand, it seems perfectly reasonable that Thomas O'Brien, on behalf of his sister, would desire to know what portion of the amount recovered would be retained for fees and expenses, and how much his sister might expect to recover. The amount stated by the attorneys as the usual fee is certainly high, but we are not prepared to say that it was excessive or unusual, under such circumstances. It is an easy matter to be mistaken as to the exact time or date, especially as to matters occurring several months prior to the time of testifying. It was possible for O'Brien to have reached the office after leaving his work, and he may have been mistaken in stating that he first went to his home; and, after carefully reading the testimony of all of these witnesses, we are unable to say that the interview did not take place as claimed

by respondents, and that it was understood the fee would be forty per cent. of the amount obtained.

The next important feature in this investigation, in the order of time, is the negotiation for settlement between respondents and the representatives of the railroad company.    Propositions for settlement of the Dassel wreck cases appear to have been first made about October 27, and were conducted from time to time until finally settled, November 5.    On the part of the railroad company the matter was in entire charge of John R. Howard, claim agent, and W. E. Dodge represented the claimants' interests.

Howard testified that he offered to settle the Fitzgerald and Hendrickson claims for $6,000, which was declined by respondents, but they agreed to accept $6,000 in settlement of the three cases, other than the Fitzgerald case; that on the morning of November 3 he had been instructed by the general solicitor to make an offer of $8,000 for the four cases, but to settle none of them unless all were disposed of; that accordingly on that day, in respondents' office, he offered a lump sum of $8,000, apportioning $5,000 to the Fitzgerald claim, and that respondents refused the same, and demanded $10,000; that on the morning of November 5 W. E. Dodge telephoned the witness to meet him at the depot in St. Paul, stating, "If you want to settle those cases, I will settle the four for $8,750, and I must know right off."    Corroborating Howard, the general solicitor, Mr. Wilkinson, testified that on November 3 he had directed Howard to make settlement of the four cases for $8,000, and that on the afternoon of the next day Howard reported to him that the offer had been made and declined.

Upon the part of respondents, W. E. Dodge testified that on two or three occasions he proposed to settle all of the cases for $10,000; that on November 3 Howard came to his office, in Minneapolis, offering $6,000 in settlement of the four cases, but the offer was declined; that separate propositions were then requested for each case, and that Howard refused to settle any one of them unless they were all disposed of; that Howard made no offer of $8,000, and refused to give more than $6,000; that on November 4 he called up Howard by 'phone, and asked him if he had concluded to offer more than $6,000, and that Howard replied that the general solicitor and the board had considered the matter, and $6,000 was the limit, and that the offer would be withdrawn unless

accepted before closing time that afternoon; that on the evening of November 4 the witness met Howard at a hotel in St. Paul, and, in the presence of Mr. Heino and Mr. Hookway, asked him if he would bring over the $10,000 and fix it up, to which Howard replied that he would bring $6,000; that on November 5, at the Merchants' Hotel, in St. Paul, he again met Howard, who still insisted upon a $6,000 settlement, but then and there, for the first time, finally agreed to split the difference and give $8,000; that the witness told Howard if he would raise it $750 it would be accepted, and Howard agreed to submit the matter to the solicitor and vice president; that, after returning to Minneapolis, Howard, on November 5, telephoned his acceptance of the proposition of $8,750, stating he would be over and fix up the claims that afternoon.

Miss Le Beau corroborated Mr. Dodge by testifying that November 3 Howard made an offer of $6,000 for the four cases, and that Dodge demanded $10,000; that on the morning of the fourth she heard Dodge telephone Howard and ask whether or not he would pay the $10,000. John R. Heino testified that he was present at the Merchants' Hotel on the afternoon of November 4, and heard Dodge ask Howard whether he would pay $10,000; that Howard replied that $6,000 was the best he could do—that he had consulted with the general solicitor and the board, and that $6,000 was the limit.

C. W. Hookway testified that he was also present at the Merchants' and heard Dodge say, "You had better bring over the $10,000," to which Howard replied, "No; I will bring $6,000."

Charles C. McElwee, at that time first assistant claim agent for the company, testified that, the afternoon of November 3, Howard showed him a memorandum in his own handwriting which read, "I have offered $6,000, and they can take it or not," and that, according to the memorandum, $3,500 was apportioned to the Fitzgerald claim, and $750 to the Rankin claim; that on the evening of the same day the witness communicated with respondent W. E. Dodge over the telephone; informing him he believed the company had gone about as far as they would, and that he ought to be satisfied.

Respondent W. E. Dodge testified that November 3, in his office, Howard refused to give $10,000, or any more than $6,000. On reexamination, Howard admitted that respondents had demanded $10,000,

and that he may, in a joking way, have offered $6,000; admitted that he had had several conversations with respondents over the 'phone, but could not fix dates. This witness does not specifically deny that he did not make the statement over the telephone that the board had considered the matter, and fixed the limit at $6,000, nor that the offer must be accepted by the close of office hours on that day, but was satisfied with stating that he had no recollection of such a conversation.

We accept, without question, the testimony of the general solicitor to the effect that November 3 he authorized the claim agent to make settlement of the four cases for $8,000, and, upon the morning of November 5, the matter having been referred to him for the second time, authorized a settlement for $8,750, but we are not justified in concluding that Howard acted upon the suggestion of his superior. It fairly appears that Howard continued his negotiations with respondents, insisting upon a settlement of $6,000, until the morning of November 5. The testimony of the claim agent with reference to these negotiations lacks that precision and clearness which is necessary to overbalance the array of contradictory and corroborative testimony upon this point. He may, however, have attempted to prolong the controversy for the purpose of effecting a better settlement than authorized by his superior.

The next point of importance contended for on the part of respondents is that on November 3 Thomas O'Brien came into their office, stating he was dissatisfied with the percentage basis as to fees, and requested that a definite net amount be fixed, whereupon it was agreed that Mrs. Fitzgerald should receive $3,000, and the attorneys to have all that could be recovered over that amount. Miss Le Beau testified that O'Brien asked for a paper or letter explaining the facts of the proposal and settlement to show to his sister and brother, and that the letter, Exhibit 3, was dictated to the witness by W. E. Dodge during the morning of November 4, and written out on the afternoon of that day. John R. Heino also testified that he was present November 3; heard O'Brien say he did not like the percentage basis, and that Mrs. Fitzgerald ought to receive $5,000, and that it was finally agreed that she was to have $3,000 net. Thomas O'Brien denied absolutely that any such agreement was made, or that he ever requested a letter or paper to show good faith, or that Exhibit 3 was written for that pur-

pose.   Here, again, is a sharp conflict in the evidence, and, without stopping to analyze it, we will pass this proposition, giving respondents the benefit of the doubt.

The letter which plays so important a part in this unfortunate controversy should speak for itself, and we set it out in full:

Willis E. Dodge and Vernon W. Dodge
Lawyers.

400 Kasota Block, Minneapolis, Minn.

Nov. 4, 1903.

Mr. Thomas O'Brien,
Minneapolis, Minn.

My Dear O'Brien: I have been constantly engaged during the last two days in an effort to come to an understanding with the Great Northern Legal and Claim department, in the Dassel wreck claim.

In this I have been advised from time to time from those on the inside as to what might be expected as a limit. These matters are controlled by what is known as the Executive Board, consisting of three officers of the company, one of whom is the general solicitor. The limit fixed by the board in the case of Mrs. Fitzgerald is thirty-five hundred ($3,500) dollars, to cover her claim, attorney's fees and expenses. The company has paid and will pay her hospital expenses and doctor's bill in addition.

I am satisfied that this is the limit that they will pay in settlement and have been notified that the proposition will be withdrawn at four o'clock today, unless accepted. I know of no case of this kind where the verdict has been rendered (in either Ramsey or Hennepin county), in the last twelve years, for more than five thousand ($5,000) dollars, under the most favorable circumstances, and I am decidedly of the opinion that the proposition made is, at least, as good as a five thousand dollar verdict would be after exhausting the resources of the company in the district and supreme courts with the necessary expense, work and worry, and its effect upon the nervous system of Mrs. Fitzgerald.

Personally, I would prefer to take the five hundred ($500) dollars, less 25 per cent., or one hundred and twenty-five ($125) dollars to be paid to you for your assistance, than to take chances on the results of litigation to cover the next year or two.   Before arriving at this decision we consulted with Dr. Hare, who knew Mrs. Fitzgerald's physical condition prior to the accident, and knows how she is today, and what her prospects for recovery are.   I consider him perfectly honest and friendly to your interest.

He expressed himself as being decidedly in favor of the settlement as against the hazards of litigation in the courts, and will advise both yourself and Mrs. Fitzgerald accordingly.

The company have a great many claims and can give only a limited time to each.   If this proposition is not accepted by four o'clock this afternoon, I do not think it will be renewed.   If it is accepted she will receive her money by tomorrow night.   In the event of its acceptance, they promise to settle the Rankin case so that he will receive four hundred ($400) dollars, and we will receive one hundred dollars, 25 per cent. of which goes to you.

He was about to leave for the North, and should he do so, we stand no show of recovering anything.   I am of the opinion, after many years of experience in this line of business, that we cannot afford to reject the offer, but after consultation with your physician, Dr. Hare, I leave it entirely to yourself and Mrs. Fitzgerald, only we must get within the time specified.

W. E. D.                                        Yours truly,
                                        Willis E. Dodge.

As before stated, respondents claim that this letter was written at the request of Thomas O'Brien to set forth the facts of settlement as evidence of his good faith.   On the afternoon of the day it was written, according to the testimony of O'Brien, respondent V. E. Dodge delivered the letter into his hands at the American Bridge Works, which was the first intimation he had of it, and further stated that he refused to authorize a settlement upon the terms therein mentioned.   On the same day, V. E. Dodge, accompanied by Dr. Hare, visited Mrs. Fitz-

gerald at the hospital, and delivered a copy of the letter to her. The doctor advised acceptance of the terms, and she consented to a settlement upon that basis, provided her brother Thomas was satisfied. While there is some conflict in the testimony, it appears by the testimony of Dr. Hare that he and V. E. Dodge then visited O'Brien at the bridge works, and that he refused to agree until he consulted his sister, which he did, and during the evening he also acquiesced.

It is positively established by the testimony of the general solicitor that there was no executive board whose duty it was to pass upon such claims, the final arbiter being the general solicitor. However, it was claimed that the persons whose duty it was to fix the limit in such cases were sometimes referred to by claim agents and attorneys as the "board," and this for the purpose of conveying the idea to claimants that the amount proposed for settlement was final. Howard does not specifically deny that such use of the term was made, and, as before noted, he does not specifically deny that a time limit was fixed on November 4. On this state of the evidence, it is not satisfactorily established that there was not some foundation for the reference in the letter to the action of the "board" and the time limit.

There are two prominent circumstances connected with the letter and accompanying settlement which are difficult to reconcile with honest motives on the part of respondents: First, the unsatisfactory nature of the evidence tending to show a positive agreement on the part of Mrs. Fitzgerald and her brother that, in consideration of the settlement, respondents were to receive all they could recover over $3,000; second, the fact that respondents succeeded in obtaining from the railway company, almost immediately after coming to terms with Mrs. Fitzgerald, the additional sum of $1,500.

If the $8,000 offer had been made by Howard November 3, as claimed by him, or if respondents had reasonable ground to believe the company would raise the offer of $6,000, then it is impossible to justify their conduct in urging the $3,500 settlement upon Mrs. Fitzgerald, and representing to her that their fees would be $500. We are aware that arrangements of the character testified to by respondents are not uncommon in the profession, and that attorneys sometimes assume grave responsibilities, owing to the insistence of their clients to be guarantied some specific amount. If the original arrangement was for forty

per cent. of the entire amount, and afterwards changed, as stated, and respondents in good faith urged the settlement for $3,500, believing it was for the best interests of their client, and they preferred to accept $500 as a fee, rather than prolong the litigation, then they could legally reserve the right to retain for themselves such further sum as they might secure, and they would be relieved from the imputation of getting the extra $1,500 by perpetrating a fraud upon their clients.

The general features of the Rankin case are covered by the foregoing discussion. O'Brien solicited that claim for respondents, and was to receive twenty five per cent. of the fee. Rankin admits he told O'Brien that he would be satisfied with $400. If there had been no arrangement as to fees, as claimed by Rankin, to retain $600 under the circumstances would be an excessive charge, not for a moment to be tolerated, but we are unable to find from the evidence that the arrangement was not made that respondents might retain as their fee whatever amount they could get over $400.

In weighing the testimony of the witnesses, we have not the benefit of personal observation, but there are some considerations which bear somewhat upon the credibility of the witnesses upon both sides. Thomas O'Brien was paid a commission for securing the business, and a civil action is pending on behalf of the claimant for the recovery of $1,500 from respondents; the proceeds to be divided between herself and her attorneys. These are unfortunate circumstances, placing the parties under the imputation of self-interest. On the other hand, there is some foundation for the charge that some of the witnesses called by respondents in corroboration were conveniently present at times of necessity.

But the public manner in which a record was made of the final settlement is entitled to consideration, the same being apparently consistent with respondents' defense. On November 5 Howard brought over blank checks to be filled out with the proper amount in each of the four cases, and respondents gave him the amount of $5,000 to be inserted for the Fitzgerald claim. A stipulation also was entered into, and filed in the pending case, that judgment should be entered for the sum of $5,000, and that the judgment be satisfied.

While it is not necessary to establish a charge against an attorney at law which will result in his disbarment, beyond a reasonable doubt,

yet such a charge is so grave, and the consequences of a conviction so serious, that something more than a preponderance of the evidence—the rule in civil actions—is required. The rule in such a case is that, to justify a conviction, the evidence must be full, clear, and convincing. People v. Barker, 56 Ill. 299; Barker's Case, 49 N. H. 195.

Comprehending the gravity of the accusations, and conscious of our duty to assist in maintaining the integrity of the bar by eliminating unworthy members, we have, after full consideration of the evidence, come to the conclusion that the charges have not been sustained.

Order to show cause discharged.

DOUGLAS, J. (dissenting).

I regret that I am unable to concur in the opinion that the charges of fraud and unprofessional conduct presented against W. E. and Vernon Dodge are not established by the evidence. . The issue chiefly involves their acts in accounting for the amount received in compromise of two claims for damages for injuries received, respectively, by Mary Fitzgerald and Rankin in a railroad accident

It is conceded that on November 5, 1903, respondents received from the railway company $5,000 upon the former, and $1,000 upon the latter, claim, and, under authority conferred by power of attorney, duly receipted therefor. A few hours prior on the same day they obtained the power of attorney from Mary Fitzgerald, and gave her the personal check of W. E. Dodge for $3,000, and reported that a settlement was about to be closed up on a basis of $3,500, which was authorized by Mrs. Fitzgerald personally after a conference with her brother Thomas O'Brien the evening before. The evidence is conclusive that, early during the day prior, her brother refused to sanction this proposed settlement, and that she also refused unless he consented. These negotiations took place between them and respondents at the hospital, and shop where Thomas O'Brien worked, and were carried on by Vernon Dodge in the presence of Mrs. Fitzgerald's physician, Dr. Hare.

The terms of the settlement proposed, including even the amount of attorney's fees to be charged, were set forth in a letter signed by W. E. Dodge. This letter appears in full in the majority opinion, and admittedly states the proposition for settlement accepted by Mrs. F.,

and the only one submitted to her personally.  Respondents, acting as her attorneys, collected on the same day $1,500 in excess of the amount which they verbally and by representations contained in said letter induced her to accept, kept every dollar of it, and admit they never reported the collection of the excess.

This is justified upon two grounds:  (1) That Thomas O'Brien on October 17, while discussing the question of fees for prosecuting the cause in the courts, agreed to give them forty per cent. of the amount collected; (2) that during the forenoon of November 3 he agreed, on behalf of his sister, to give respondents the entire amount collected in excess of $3,000.  Both agreements are denied by him, and the time books of the shop where O'Brien works show that he was at work therein during the forenoon of that day.  However, if these agreements were actually entered into, the former was superseded by the latter; and the latter, by the undisputed evidence contained in the record, was repudiated by Thomas O'Brien November 4, the day after it was alleged to have been made, and before being acted upon.  A glance at the proposition contained in the letter above referred to, written by W. E. and presented by Vernon Dodge, shows that it was identical in substance with the one relied upon, so far as concerned the net amount Mrs. Fitzgerald was to receive.  This was twice positively refused by O'Brien, and also refused by his sister, unless the consent of the former was first obtained.  Later in the day he visited his sister, and finally they consented to the settlement on the basis outlined in the letter, and in the evening he informed respondents of their conclusion.  Upon this crucial point Dr. Hare testified:

> Q. In this talk with you, or talk there with Mrs. Fitzgerald, did he say how the $3,500 would be divided?  A. As I remember it, we discussed that; both he and I with her stating that she would receive $3,000, and that $500 would be retained by them for expenses and fees.  It was also stated that $125 of this $500 would go to Tom.  Q. Did she decide to settle at that time? A. She did upon one condition.  Q. What was that?  A. That was that Tom was perfectly willing to agree to the settlement on the conditions named.  She stated definitely that she had given her case into his hands, and that she would do nothing without

his positive consent.   Q. Where did you go from the hospital?
A. To the American Bridge Company's plant.   Q. Who did
you see there?   A. Saw Thomas O'Brien.   Q. Have any talk
with him on the subject?   A. Yes, sir.   Q. Will you please
state that?   A. I first stated to him that we had been to the
hospital and seen his sister; that we had made known to her
the terms of the settlement which could be obtained; that she
had agreed upon one condition—that he was willing to settle.
And subsequent to that he manifested some show of temper over
the situation.   He said he would not settle until he had seen her
again.   After this I left the talking to Mr. Dodge.   Q. Can you
recall the conversation between Mr. O'Brien and Mr. Dodge?
A. Mr. Dodge again stated the fact that the terms of the settle-
ment would be withdrawn at 4 o'clock; that Mrs. Fitzgerald
was going to settle on those conditions, provided he was willing
—and urged upon him the advisability of settling at that figure,
stating that it was probably a better figure than could be ob-
tained by waiting and carrying the matter to court.   Q. At that
time was anything said about getting an extension of time be-
yond 4 o'clock?   A. Mr. Dodge stated he believed it would be
all right up to any time in the evening, when Tom stated that
he would be under the necessity of seeing his sister again be-
fore he would agree to the settlement.   Tom stated he would
go from his work to see his sister about 7 o'clock, and would
meet Mr. Dodge at some restaurant about 8 o'clock, or as soon
as he could get away from the hospital.

This evidence of a disinterested witness stands undisputed, and the
proposed settlement was closed up with Mrs. Fitzgerald the next morn-
ing without modification in the slightest particular.

If respondents desired to, or had a right to, rely upon a verbal un-
derstanding had at their office with Mrs. Fitzgerald's brother on the
day prior, which he denies, when he was at work in the plant, it is
indeed unfortunate that they wrote a letter positively indicating that
such an agreement did not exist; and, again, the fact that they entered
into another and decidedly different agreement, so far as their fees

were concerned, with their client, personally, the day following, and almost immediately executed it, is also equally unfortunate, from a standpoint of these proceedings. I feel bound to say that, in my judgment, the agreement for settlement finally made by respondents with their client personally, which was acted upon and executed, binds both parties. If so, respondents, as attorneys, collected $1,500 which they did not report or account for to their client.

This view is corroborated by the acts of respondents in another particular, concerning which the evidence is also uncontradicted. Mr. Dodge, in the proposition for settlement set forth in said letter, offered to give Thomas O'Brien one-quarter of the amount of his fees, which were stated to be $500 in the Fitzgerald case, and $100 in the Rankin case. This would give O'Brien $125. On the evening of November 6, the day after settling with Mrs. Fitzgerald, and receiving $5,000 from the railway company upon one claim, and $1,000 upon the other, W. E. Dodge, in the presence of Vernon Dodge, gave O'Brien his personal check for $125, and stated that it was twenty five per cent. of their fees in the two cases, and in full for the services of O'Brien therein. Thus, by clear implication, respondents suppressed the fact that they had collected the additional $1,500.

O'Brien represented Mr. Rankin, and at the same time Col. Dodge gave him a check for $400, to be given Rankin, and stated that he had settled the Rankin case for $500, while in truth he had collected $1,000. No report was made by respondents to Rankin of this settlement, except through O'Brien, who, as he understood the facts, reported that $500 had been realized, and $100 retained by respondents for their services. Respondents justify their acts in retaining $600 for services by evidence tending to show that Rankin agreed to give them the total amount collected in excess of $400. In view of the strict degree of proof required, I concur with the majority of the court in the opinion that the charge in the Rankin matter is not sustained.

However, from respondents' standpoint, if they were entitled to retain the extra $500 in the Rankin matter, and the extra $1,500 in the Fitzgerald settlement, under their agreement with O'Brien, $500—being twenty five per cent. of their fees—was due to him. The withholding of this amount from him can hardly be said to be consistent with the ethics of the profession.

In my judgment, the undisputed evidence sustains the charge that respondents are guilty of fraud and double dealing as members of the bar, and both should be suspended from practice for a limited period.