IN RE APPLICATION FOR DISCIPLINE OF FIORI L. PALARINE, ALSO KNOWN AS F. L. PAGLIARINI, AN ATTORNEY AT LAW.[1]

June 29, 1945.

No. 33,682.

*Philip Neville,* for State Board of Law Examiners.
*Joseph Granbeck* and *Lyle Pettijohn,* for respondent.

PER CURIAM.

This is a proceeding by the State Board of Law Examiners to discipline respondent, Fiori L. Palarine, an attorney at law, or remove him from his office for wilful misconduct as such attorney.

The accusations involve respondent's actions in connection with his employment as attorney to secure a pardon or commutation

[1]Reported in 19 N. W. (2d) 439.

of sentence for Clarence C. Hamblen, Floyd Strain, and Anthony Strain and a parole for Arthur Barness, all inmates of the Minnesota state penitentiary. Only on one other occasion has respondent acted as attorney in similar proceedings.

Respondent was born in Italy in 1905. He came to America at the age of ten. After completing his law course at the St. Paul College of Law in 1928, he was admitted to the bar and has practiced his profession in the city of St. Paul since that time. He is married and has two children.

Some inferred criticism is leveled at respondent because of his change of name and the circumstances under which he was admitted to citizenship. His name was originally Pagliarini. There is nothing in the facts connected with those matters that calls for any critical comments by this court.

The first accusation involves respondent's activities in connection with the application of Clarence C. Hamblen for a parole, pardon, or commutation of sentence. The facts involved in this matter merit no discussion. Counsel for the board in his argument to this court stated that respondent should not be disciplined because of his conduct in the Hamblen matter, and the record fully sustains that statement.

The other accusations involve respondent's activities in connection with the efforts of Floyd Strain and his brother, Anthony, and Arthur Barness to secure for them a parole, a pardon, or a commutation of sentence. The employment of respondent by Barness grew out of his employment by the Strain brothers. The facts in the two matters overlap and interlock and, to some extent, will have to be considered together.

On June 4 and again on June 13, 1940, one Helen Norton, a friend of Floyd Strain, wrote respondent and asked him to see Strain at the penitentiary, as Strain desired his professional services. On June 14, respondent visited Floyd. The following day, June 15, he wrote Floyd: "I am writing this letter to confirm the agreement we had yesterday to the effect that you are to pay me the sum of One Hundred ($100.00) as a retainer in

connection with your case." Floyd denies that the $100 paid was for retainer and investigation, in spite of respondent's letter confirming their agreement. Floyd said: "No, I had my case investigated before; he didn't need any more to investigate it * * *." He said respondent "would have to look in the records, of course," but no other investigation was necessary as "the case was fully investigated." He said the $100 was included in the $500 total and was not a retainer. On the occasion of the second visit, Helen Norton went along. At that time, it was agreed that respondent was to receive an additional $500 in the event that Floyd and Anthony were released. Anthony was not present at the first two interviews. On the third visit, on June 28, Floyd gave more information and more names. On July 9, respondent, through Warden Utecht, received $80 on retainer, $40 for each of the Strains. That was the first money he received. Already on July 10 Floyd was becoming critical of respondent because he was not getting results speedily enough. He wrote: "As far as I am concerned we don't know if there is any work being done on our case or not. And we could have our releases in a very short while with just a little action." On September 14, an additional $35 was received by respondent from Anthony Strain. He received an additional $20 from a Mrs. Christopherson, a sister of the Strains.

In 1933, in the district court of Jackson county, this state, Floyd and his brother were convicted of bank robbery. They were tried separately. Previous to that, Floyd had been convicted of a crime in South Dakota. His record also discloses two convictions prior to the one in South Dakota. Anthony's record shows two convictions previous to the one in Jackson county.

Two or three transcripts of several hundred pages each, covering the proceedings in the Jackson county and South Dakota cases, were given respondent to look over. He was also instructed to see Barness, another prisoner, who, according to Floyd, knew, or had the means of finding out if he were released, who had committed the bank robbery for which Floyd and his brother were serving time. It was thought that if the release of Barness could be se-

cured first, then, through his efforts, the two Strain brothers would be pardoned or their sentences commuted. Floyd wanted quick results, and on September 25, 1940, he wrote respondent: "You really have had more than enough time to have the case in order. * * * There just doesn't seem to be any reason for any more alibis, so you will either have to do one thing or another." He further wrote that if respondent did not have everything in order by September 30 he was "really going to start pushing this pen," and was going to write "to the Warden, or Mayor, Attorney General or Stassen." He continued: "I'm damn angry about your promises." On October 9, he wrote that he was going to take the matter. up with the bar association at once. It is apparent that Floyd was a rather difficult client, who refused to consider the amount of work involved in investigating and preparing proper applications to the Board of Pardons for a convict whom the jury had found guilty of the crime of bank robbery and who had to his discredit three prior convictions. On June 17, 1941, respondent was finally discharged by Floyd, who asked to have the transcripts returned to him, which was done.

As stated, Floyd asked respondent to see Barness, who, according to Floyd, claimed that he either knew who committed the crime for which Floyd and Anthony were incarcerated, or, if released, could find the persons who committed that crime. So respondent went to see Barness the first time on June 28, 1940, two weeks after he first saw Floyd. He visited with him nine times, the last time on February 5, 1941. Barness had entered a plea of guilty to the crime of bank robbery and had been imprisoned since 1937. Barness had no money, and his daughter, Alma Barness, later Alma Olsen, was to raise it. Barness testified that respondent told him it would take $500 to do anything with his case—to get him a parole. Barness was asked: "Did you and Mr. Palarine have any conversation as to when or how he was to be paid?" to which he answered: "Well, he wasn't to get any money until I was released, and then he was to get the money. That is what I always stood on; no money until I got a parole." Alma, his

daughter, proceeded to raise the money. Respondent told her the amount he wanted. She said she could not raise that amount, but could borrow $365 from George Olsen, with whom she was keeping company at that time. George had it in the bank. About September 15, 1940, the money was placed in escrow at the Produce Exchange Bank, in conformity with the following instrument:

"That said sum of Three Hundred Sixty-five Dollars ($365.00) is to be paid over to F. L. Palarine in the event that Arthur Barness receives a parole, but in the event that said Arthur Barness is not paroled, then said sum is to be returned to George A. Olsen.

"This agreement is to last for sixty (60) days during which time said money is to be kept by the Produce Exchange Bank, and no withdrawal from it except as hereinbefore specified."

The agreement bears the signatures of Olsen, Alma, and respondent. The money remained in the bank about 90 days. On December 16, Olsen wrote the president of the bank:

"You are hereby authorized and directed to deliver to F. L. Palarine the sum of $365.00 which you are holding subject to an escrow between us entered into some time ago."

On the same day, respondent gave Olsen and Alma the following receipt:

"I, F. L. Palarine, do hereby acknowledge receipt of the sum of Three Hundred and Sixty-five ($365.00) Dollars from George A. Olsen, to be kept by me and not to be turned over to any person without the written permission of said George A. Olsen and in no event unless Arthur Barness is released on parole."

Alma testified that respondent said he needed the money for someone else, but did not say for whom.

In the early part of 1941, Olsen and Alma went to the office of respondent and demanded return of the money. They said they were going to get married and needed it. Respondent told them he thought he ought to be paid for the expenses he had incurred and for time spent on the matter, and refused to turn it all back.

Alma and Olsen then went to see Paul C. Thomas, who was then chairman of the Committee on the Practice of Law of the Ramsey County Bar Association. Mr. Thomas wrote respondent a letter asking him to be present at a committee hearing to be held on April 29, 1941. Respondent did not appear at the meeting, but about an hour and a half after the committee had convened he sent word that he was in Minneapolis trying a case and was unable to be present and asked for a continuance. It is apparent that respondent could readily have got in touch with the members of the committee in advance of the meeting, or, at least, when it convened. His action in that connection merits censure. Aside from this instance, as far as the record indicates, respondent attended all conferences or hearings to which he had been summoned. On May 20, 1941, Mr. Thomas called up respondent and then wrote him stating that Olsen and Alma needed the money, as they were going to get married, and asked him if he would not release part of the money so that they could buy furniture. Mr. Thomas also told him that the matter of their complaint had already been referred to the State Board of Law Examiners. Respondent stated that he had some claims against Olsen. He had examined an abstract for him and had done some additional work, which in all amounted to $18. He also said that he felt he was entitled to be paid his expenses for the investigation made in connection with the Barness proceeding and also attorney's fees. Mr. Thomas told him that, while he might have a claim against the money for anything due him from Olsen, obviously he could not hold Barness's fees out of the money. Respondent said he would release $200 provided Olsen would come and get it the day following. Mr. Thomas told respondent "that it was understood that the money would be released without any strings whatsoever; that neither his [respondent's] payments nor the acceptance of the money [by Olsen] would in any way prejudice either of them." Mr. Thomas wrote:

"* * * I told you that the matter of Miss Barness' complaint had been referred to the State Board of Law Examiners, but that I thought it would be nice if you would release at least a part of

the money to them at this time, without prejudice, in order that their plans might not be held up.

"You told me that you were at all times willing to release part of this money to them and that you would give them $200.00 tomorrow, on the understanding that there were no 'strings' attached to it and that the payment was to be without prejudice to the rights of either side. In other words, that neither the giving nor the receipt of the check is to have any bearing on the merits of the various contentions."

On May 22, or 23, Mr. Thomas received a letter from respondent in which he stated that he had incurred an expense of more than $50 in this matter. He wrote:

"* * * My office records show that Miss Barness and I and sometimes her family made two trips to Anoka, two to Cedar, three to Minneapolis, and at least ten to Stillwater, as shown by the records at the prison. On all of these trips, except one, I was away from the office at least half a day. In addition to this, I spent considerable time in conference not only with Miss Barness and Mr. Olsen but with a number of other persons in connection with this matter. I feel that I am entitled to a fee of at least One Hundred and Fifty and No/100 ($150.00) Dollars in addition to the payment of the expenses incurred in their behalf."

He then detailed the work he did for Olsen for which he made a charge of $18, and which, he said, was reduced to $15 at Olsen's request. He continues:

"* * * The balance of One Hundred and Fifty and No/100 ($150.00) Dollars, I was going to turn over to them yesterday afternoon when I received your letter.

"In order that we may be certain that the receipt is in proper form and there [sic] there will be no strings attached to it I'm going to ask you to prepare it and send it over to my office for their signature."

On May 23, Mr. Thomas prepared pleadings in summary pro-

ceedings against respondent in behalf of Olsen and Barness. He took them up to Judge Clayton Parks of the Ramsey county district court for his signature. Judge Parks did not sign the order, but called up respondent and told him he thought he was wrong, that he was very foolish in withholding the money, and that if he had any fees coming he thought he should surrender the money and bring an action for his fees. Judge Parks testified that respondent's answer to the suggestion was: "Well, do you think that is the thing to do? If you think I won't be incriminating myself, I will certainly do it right away." Respondent followed Judge Parks' suggestion and paid back the money. He received a receipt dated May 26, 1941, for $365, signed by Olsen. This receipt contained the following statement:

"It is understood and agreed that Mr. Palarine has turned this money over to me with a full reservation of rights and without prejudice to his right to bring an action for alleged services in connection with the Barness matter."

Under date of May 26, Mr. Thomas wrote respondent:

"I have your letter of May 26, enclosing the check for $365.00 in the Barness-Olsen matter. This is received by me and them under the specific understanding that your delivery of the same is not an admission or waiver by you of any rights that you may have to bring an action to recover for your legal services."

As stated, complaint had already been made to the State Board of Law Examiners. A hearing was held on September 12, 1941. All the members of the board were present, as well as respondent. The whole Barness matter was gone over at that time. However, no questions were asked about the alleged bribery, to which attention will be called later. On September 19, 1941, respondent received the following notification from the secretary of the board:

"This will advise that the complaint of George Olsen and Alma Barness against yourself—after full consideration by the Board, was dismissed."

On April 3, 1943, the Committee on the Practice of Law of the Minnesota State Bar Association urged upon the State Board of· Law Examiners the necessity of instituting appropriate proceedings as expeditiously as possible. Because of this request the matter was reopened.

The more serious charge against respondent will now be considered. It is charged that he wanted $500 to fix the Board of Parole to get Barness out. Floyd was asked:

"Did Mr. Palarine and you discuss how he was going to assist you?

"A. That is right.

"Q. And tell us what that discussion was.

"A. Well, he said he wanted $500, if he had to fix the Board to get Barness out of jail.

"Q. He had to what?

"A. Fix the Board to get Barness out of jail.

"Q. Did he mention any particular names?

"A. Carlgren and Lindholm.

"Q. And did he mention that on one occasion or more?

"A. No, he mentioned that every time he came out here.

"Q. Did he indicate to you that a portion of the money would be paid to the gentlemen or someone else?

\* \* \* \* \*

"A. He said that he wanted this here money to fix Lindholm, and he had to do this through Carlgren, or whatever his name is."

Respondent visited Floyd eight times, the first time on June 14, 1940, and the last time on September 11, 1940. Helen Norton was present five out of the eight times. She said she was friendly to Floyd and anxious to have him get out of prison. She was not along the first, third, and last times. When she was present, the parties sat close together, and she says she heard all the conversation between Floyd and respondent. Floyd admits that she was present a number of times when respondent visited him. His brother, Anthony, who was present three or four times, refused

to testify. Helen Norton testified that the Strain brothers were supposed to pay respondent $100 for expenses and to start the case. They were to pay $500 apiece when they got out. She said that after two or three trips she heard about Barness. She heard Floyd say that Barness knew the men who committed the robbery and could get them (the Strain brothers) out of prison. Respondent was to see Barness. She testified that later Floyd said that respondent should apply the money he had received from the Strain brothers on the Barness case, and to use that money as a down payment on the case for retainer and expenses, and Barness was supposed to raise the rest of the money. Barness was supposed to raise $365, the balance of the $500, Floyd said. She was asked:

"And did you ever hear Mr. Palarine make any suggestion about fixing anyone?

"A. No, sir, I never did.

"Q. Or using any part of that money for any other purpose than fees?

"A. No, sir, I never did.

"Q. Did you ever hear him mention a Mr. Carlgren or a Mr. Lindholm in any of those conferences?

"A. No, sir, I did not.

"Q. Did the Strains ever mention them?

"A. No, no, they did not.

"Q. You never heard anything of that kind mentioned or stated?

"A. No, sir.

"Q. You have come in here under subpoena, have you not?

"A. Yes, sir, I have."

She said she never heard Palarine mention Lindholm. At first, she said, Floyd seemed satisfied over the way respondent was carrying on the case. Later, in July or August, he seemed to think that respondent was not going ahead with the case as he should. At first, she also had the idea that respondent was not going ahead with the case. She said that later, after having made a

few more trips and understanding the case more, "I understood that he was doing all he could."

Summarizing the record on this phase of the matter, we find Floyd stating that respondent wanted money to fix the Board of Parole, and that he made that statement every time he saw Floyd. His brother, Anthony, who was present three or four times when respondent interviewed Floyd, refused to testify. Helen Norton, Floyd's friend, who was present five out of the eight times respondent saw Floyd and who heard all of the conversations, testified that no mention of the fixing of anybody was made. Respondent denied that he made any such statement. In the long, critical letters written by Floyd to respondent—the last one October 9, 1940— there is no intimation of any such proposition. His complaint was that respondent was not pushing the matter fast enough. The charge of proposed bribery as far as Floyd is concerned certainly is not proved by a clear preponderance of the evidence.

Another phase of the charge that respondent asked for money with which to bribe officials centers around statements made by Barness. He was asked:

"And did Mr. Palarine make any statement as to how he expected to proceed to get your release?

"A. Well, I asked him that question, and he said he would have to divide it with Carlgren and the Board.

"The Court: With whom?

"A. With Carlgren and the Board; that was the parties that he was to be—

"Q. Now the Board refers to what?

"A. Lindholm.

"Q. Do you know who Lindholm is?

"A. Yes, sir.

"Q. Did you know who he was in 1940?

"A. Yes, sir.

"Q. Who?

"A. Parole chairman.

"Q. And did you know who Mr. Carlgren was in 1940?

"A. Well, he had something to do with the State Board of Control, and they were friends of Palarine."

Barness said such statements were made on several occasions. On cross-examination, his answers were very unsatisfactory. In answer to several questions about matters on which he should have been informed, he said he did not remember. As a sample, he was asked:

"Mr. Barness, what were you convicted of for which you were serving time?

"A. Supposed to be a stick-up.

"Q. A stick-up of what?

"A. Well, a bank robbery, supposed to be, as I recall it."

As stated, he had entered a plea of guilty to the charge.

Alma, the daughter, who went along with respondent each time, except possibly once, when he went to see Barness, who was present at the conversations, and, together with her husband, made the complaint against respondent which started this proceeding, and who was an important witness for the Board of Law Examiners at the hearing, was not asked, nor did she state, that she had heard any statement to the effect that respondent asked for any money with which to bribe anybody. She did say that at one time she went to see Carlgren, who was ill. She said respondent had mentioned his name and she wanted "to see if he was going to help get Dad home." There is no word in her testimony about bribery. It may be here stated that L. 1939, c. 431, art. VII, § 4, abolished the State Board of Control. The law became effective April 22, 1939. So Carlgren, in 1940, was not a member of the State Board of Control, a stipulation in the record to that effect notwithstanding. George Olsen, Alma's husband, who furnished the money in the handling of which charges are being made against respondent, and who was one of the parties who made the complaint against him, when on the witness stand gave no testimony to the effect that respondent wanted money to bribe anybody. Barness wrote several long letters to respondent, in none of which

was there any intimation made along that line. On July 31, 1940, in speaking about respondent's fees, he said: "All you have to do is to get me a proal [sic] and that will save you a lot of expence [sic]. I know it costs money where you have to look around but this way you have got it all at home." In a letter dated August 14, 1940, he wrote: "Will have the first feews [sic] in the work, but the rest you will have clear." The letters plainly show Barness's lack of schooling, but a reasonable interpretation of the above statements means that, except for the money respondent expended for work and investigation, the balance belonged to him. If at that time he had thought that some of the money was to be used in bribery, one would expect at least a hint to that effect. In a letter of September 18, 1940, written by Barness to respondent, reference is made to "too [two] guys" who are going to be against him. It is evident from a reading of the whole letter that he was speaking of two men in Anoka county who had a part in the prosecution of his case, and not to Carlgren or Lindholm. There is some intimation that the reference is to these men. There is no basis for it. Respondent denies that he made any statement to Barness that he had to have money to bribe anyone. When the money which had been placed in escrow was turned over to respondent, he stated in the receipt which he gave that the $365 was "to be kept by me and not to be turned over to any person without the written permission of said George A. Olsen and in no event unless Arthur Barness is released on parole." It is claimed, in effect, that the words "not to be turned over to any person without the written permission of said George A. Olsen" have reference to the paying over of this money for bribery purposes. There had been some talk between Alma and respondent about the employment of an additional attorney. Olsen does not testify as to any understanding that this money was to be used for such purpose. Neither does Alma. Of all persons, these are the two who should know what the money was to be used for, since it was their money, and it is fair to assume that they knew whether or not it was to be used for bribery. The language of the

receipt neither compels nor warrants such an interpretation. It does not justify the assignment to it of such a malign meaning. The referee made the following finding:

"That respondent at various times while talking with Arthur Barness and Floyd Strain about money stated that he had to divide the amount of $500 with a member of the Control Board and the Chairman of the Parole Board in order to effect the release of said inmates, Arthur Barness and Floyd Strain and Anthony Strain from prison, that he wanted this money to fix Lindholm, the Chairman of the Parole Board, through Carlgren, a member of the Board of Control."

We have set out all the material evidence in the case on the charge of asking for money to be used for bribery purposes. We are of the opinion that the charge has not been proved by a clear preponderance of the evidence, nor even by a fair preponderance.

No application for pardon in behalf of Barness was filed by respondent. He claims that in December he had arranged to file such an application, and again, in April, if turned down by that board, that he was to submit an application to the board of parole. On February 18, 1941, Alma secured a doctor's certificate as to the health of Mrs. Barness, which was to be used in connection with the application. Respondent claims that Barness did not want his case presented in December until a Mrs. Brown and a Mrs. Corcoran had been located. Later, respondent saw these women. The next thing was the demand of Alma and Olsen for the money. Respondent had also arranged for a position for Barness.

About December 20, 1940, Helen Norton went to respondent's office and showed him a letter from Floyd asking for return of the money. He refused to give it. When respondent could make no headway with Barness, Floyd discharged him. Respondent claims that the reason the Strain case was never submitted to the pardon board was that their case was to be conditioned and dependent upon the outcome of the Barness case. Floyd was asked:

"At any time between the first time you met Mr. Palarine and

the last time, did you discuss with him how the case was coming?

"A. Yes.

"Q. And tell, as near as you can, what the conversation was.

"A. Well, he said he wanted more time; that he had to get Barness out of here first in order to get the evidence, and I said: 'Well, what about Barness? * * * If you don't get Barness out of here?' 'Well,' he said, 'if I don't get Barness out of here, I will continue with your case then.'"

Floyd said at the hearing that he was not in favor of holding up his case pending the outcome of Barness's case. Respondent told Floyd that after Barness was paroled he would make the investigation which would lead to the discovery of the parties whom Floyd claimed were guilty of the crime for which he was convicted. But Floyd claims that he did not understand that his case was to be held in abeyance or to be held up pending investigation of the Barness case. There seems to have been unnecessary delay in the handling of these matters, and no applications were presented to either board. Respondent has given his explanations of this situation, and to some extent they are corroborated by other witnesses. Respondent had undertaken to perform a difficult task, and undoubtedly had foolishly expressed assurances of speedy results.

Respondent's dealings with Olsen and Alma relative to the $365 are censurable. He was not entitled to any part of it until after Barness had been released. Yet one can understand his position. He claims that he was still working on the Barness matter when he was discharged, and therefore was unable to complete the work. He felt, in view of the fact that by his discharge he was being deprived of his chance to earn the $365, he should be reimbursed for his expenses and be paid for services performed to date. It is not disputed that he had paid out considerable money in traveling about and had put in a great deal of time. The various trips to the penitentiary and other places took money and time. There is no dispute on that point. At no time did respondent say that he was entitled to retain the whole $365.

Respondent produced several character witnesses. Judge Clayton Parks of the district court testified that respondent's reputation for integrity and veracity was good. He also stated that, in his opinion, respondent was an excellent lawyer and a gentleman. James F. Lynch, county attorney of Ramsey county, who has known respondent since he began the practice of law, stated that respondent's reputation for integrity and veracity was very good. John J. McDonough, mayor of St. Paul, who had known respondent for about the same length of time, said that his reputation for veracity and integrity was very good. Harry W. Oehler, at the time of the hearing corporation counsel of the city of St. Paul, said: "I have never, never heard a single derogatory statement about Mr. Palarine." Mr. Oehler had been acquainted with respondent 11 or 12 years.

In the recent case of In re Application of Smith, formerly known as Pluto, for Reinstatement as an Attorney at Law, 220 Minn. 197, 19 N. W. (2d) 324, this court discussed the nature of the right to practice law and the purpose of disciplining an attorney. It is unnecessary here to make a restatement thereof. In that opinion, the court stated (220 Minn. 200, 19 N. W. [2d] 326):

"An attorney should be disbarred only upon a strong and convincing showing that he is unfit to practice law and that disbarment is necessary to protect the public and to guard the administration of justice." (Citing cases.)

The court in that opinion also stated that it should be slow to disbar.

The record indicates that on two prior occasions, complaints had been made against respondent. One of these involved attorneys' fees. This was litigated in court, and respondent prevailed. Nothing in the record discloses the nature of the other complaint.

In State Board of Examiners in Law v. Dodge, 93 Minn. 160, 171, 100 N. W. 684, 689, this court said:

"While it is not necessary to establish a charge against an attorney at law which will result in his disbarment, beyond a reason-

able doubt, yet such a charge is so grave, and the consequences of a conviction so serious, that something more than a preponderance of the evidence—the rule in civil actions—is required. The rule in such a case is that, to justify a conviction, the evidence must be full, clear, and convincing. People v. Barker, 56 Ill. 299; Barker's Case, 49 N. H. 195."

In In re Application for Removal of Hertz, 139 Minn. 504, 510, 166 N. W. 397, 400, this court said:

"This court will not overlook or condone misconduct on the part of attorneys, but taking from an attorney the right to earn his livelihood in the practice of his profession, after he has spent years preparing himself to do so, is of such serious consequence to him that the charges must be supported by a clear preponderance of the evidence in order to justify disbarment. 2 Enc. Ev. 138; State Board of Examiners in Law v. Dodge, 93 Minn. 160, 171, 100 N. W. 684."

And in In re Disbarment of McDonald, 204 Minn. 61, 66, 282 N. W. 677, 680, this court said:

"In considering and determining an accusation against an attorney we are mindful of what a finding of guilt means to him. It results in the loss of a profession by which he has earned a living for himself and family, and, even if there be but suspension, it seriously affects his professional reputation and impairs his earning capacity. The proof of wrongdoing must therefore be cogent and compelling." (Citing cases.)

To warrant disbarment, a mere preponderance of the evidence is insufficient. A strong and convincing showing is required. Such showing is lacking in this case.

We have come to the conclusion that the situation in this matter does not warrant discipline.

Proceeding dismissed.