# IN RE APPLICATION FOR REMOVAL OF ABRAHAM J. HERTZ.[1]

February 21, 1918.

No. 20,192.

**Attorney and client — proceeding to disbar — evidence necessary.**

1. Charges of misconduct against an attorney must be supported by a clear preponderance of the evidence to support disbarment. [Reporter.]

**Same — practice disapproved.**

2. The supreme court disapproves the practice of one attorney, who in fact is prosecuting a case, obtaining another attorney, who has nothing to do with the case, to sign the papers as attorney of record to enable the former not to appear upon the records as attorney therein. Where no one has been misled, overreached or prejudiced on account of it, the practice is not sufficient ground for the disbarment of the former attorney. [Reporter.]

**Same — dismissed for lack of evidence.**

3. Proceeding to disbar the respondent for wilful misconduct as an attorney. One charge was that as attorney for a fraternal society he entered into a secret agreement with one of its officers to pay the latter a part of his fees and swelled his bills sufficiently to enable him to do so without loss. Another charge was that he acted for both parties to a suit. Another that he brought a suit without the knowledge or consent of the plaintiff, alleged that the insured had died when in fact he was still living, and settled the suit for $500, which he appropriated to his own use. Another charge was that he collected moneys and failed to account for them to his clients. *Held*: The charges were not sustained by sufficient reliable proof and the proceeding was dismissed. [Reporter.]

The State Board of Law Examiners, through its secretary, petitioned for the disbarment of respondent for wilful misconduct in his office. Dismissed.

*Eli Southworth* and *Charles J. Traxler*, for petitioner.

*C. D. O'Brien*, *T. R. Kane*, and *Keller & Loomis*, for respondent.

PER CURIAM.

This is a proceeding brought by the State Board of Law Examiners to

[1] Reported in 166 N. W. 397.

remove the respondent, A. J. Hertz, from his office of an attorney at law for wilful misconduct as such attorney. The accusation contains five specifications of alleged misconduct:

1. From 1905 until 1916, Fred H. Silsbee was the president and general attorney of the Yeomen of America, a fraternal beneficiary society organized under the laws of the state of Illinois, and acted as executive officer or manager thereof. From time to time he employed respondent to defend actions brought against the society in the state of Minnesota. Respondent's bills for services in these cases were presented to and approved by Silsbee, and after being so approved were paid by the society. It is charged that while handling these cases respondent entered into a secret arrangement with Silsbee under which he paid to Silsbee a part of the fees received from the society, and swelled his bills to the society sufficiently to enable him to do so without loss to himself. If respondent did this and thereby assisted in transferring to an officer of the society for which he was acting as attorney moneys of the society to which such officer was not entitled, he violated his duty as an attorney. The disputed question is whether such an arrangement was in fact made and carried out.

The present method of determining the facts in cases where an attorney is charged with misconduct is somewhat unsatisfactory. The testimony is taken before a referee and comes here without any findings of fact by those who saw and heard the witnesses. Hearing the testimony as given upon the witness stand and observing the witnesses and parties as they testify, is a valuable aid in determining where the truth lies; but this court neither sees nor hears the witnesses, and must reach its conclusions from the cold record without the light which may have been thrown upon it during the taking of the testimony.

The direct evidence upon the question in dispute is flatly contradictory. Silsbee testifies that he made such an arrangement with Hertz and received payments under it. Hertz testifies that he made no such arrangement and no such payments; but states that, as he was a young practitioner, he intended, at his own expense, to procure an experienced attorney to assist him in the trial of the cases and so informed Silsbee; that Silsbee suggested that such an expense was unnecessary as he, Silsbee, was paid for his time by the society and would come and help try the cases without cost to Hertz, except for the actual expense incurred in making the necessary trips to St. Paul; that such an arrangement was made and Silsbee came and took part in trying or settling the cases; that on such occasions he, Hertz, paid Silsbee's railroad fare and hotel bills but paid nothing more, and that no charge on account of these payments was ever made to the society either in the form of padded bills or otherwise. Silsbee in effect denies the arrangement

asserted by Hertz. There is no other direct testimony upon the question in dispute.

Hertz was merely employed to defend those specific cases which Silsbee turned over to him, and it seems to have been understood that he was at liberty to take other cases against the society. The last business which he transacted for the society seems to have been in 1913. The Yeomen and a number of other fraternal societies had issued policies to a large number of Russian and Rumanian Jews residing in the cities of St. Paul and Minneapolis. Subsequently the societies claimed that many of these policies had been obtained by aged people by misrepresenting their ages, and took steps to cancel such policies and to defend against actions brought upon them, as appears from numerous cases which have reached this court. After his employment by the Yeomen had terminated, Hertz took and prosecuted numerous cases against that and the other societies to enforce payment of the policies above mentioned. In the latter part of 1915 or early part of 1916, an investigation of the management and affairs of the Yeomen was begun by the authorities of the state of Illinois, whereupon Silsbee terminated his official connection with the society by resigning. An Illinois attorney named Lee Mighell became his successor. After investigating the cases then pending, Mighell reported to the society that not one per cent of "the Jewish fraternal cases in St. Paul and Minneapolis" were free from the taint of fraud, and that he considered Hertz the leading conspirator, and recommended, as the easiest means of defeating the cases, that proceedings be taken to disbar Hertz. Acting upon this report the society made a written proposition to the other societies interested in which, after reciting what Mighell had reported, they state:

"Mr. Mighell further says that he and the other members of the firm, Mighell, Gunsul and Allen, will undertake the task of disbarring Mr. Hertz with the understanding that some one will furnish the expenses connected with the effort, and he believes that the firm should be paid a fee of $3,000.00 providing they are successful, and Mr. Mighell states definitely that no fee whatever will be charged unless the disbarment proceedings against Mr. Hertz are successful. The case would take several months before reaching the final decision of the supreme court and the expense for the investigation, cost, etc., is estimated at $2,000.00."

They further state: "Our board has decided to make the following proposition to other interested societies: Namely, we advance the cost connected with the disbarment of A. J. Hertz, and if the proceeding fails we will pay these costs ourselves, but should the proceedings be successful then each of the fraternal societies interested is to pay the sum of $250.00. Now, there are twenty societies, more or less interested, and it will take the co-operation of each one to make the estimated amount which will be necessary to carry

out this project. Please take this matter up at once and let us know at the earliest possible moment as to whether you wish to participate in this project with the understanding that if it is unsuccessful you are to be under no obligation, but should the proceeding against Mr. Hertz prove successful you are to pay the sum of $250.00."

Mighell's position and interest are shown by the foregoing statements. The present proceedings are based upon charges which he made to the board of law examiners, and Silsbee appeared as a witness in support of such charges at his instance. We have mentioned these matters as they have some bearing when weighing the evidence. Silsbee testifies to the corrupt agreement; Hertz testifies as positively to the contrary, and gives his various transactions with Silsbee in much detail. The few facts, outside their own statements, which bear upon the question, seem to corroborate Hertz fully as strongly as they corroborate Silsbee; and, after considering all the facts and circumstances, the court is unable to say that this charge is supported by a preponderance of the evidence.

2. The second charge is to the effect that Hertz acted for both parties in the case of Zekman against the Yeomen. This charge is wholly without support in the record. Zekman, a friend of Hertz, sought to employ him to collect a policy issued by the Yeomen, and was informed that Hertz could not take the case on account of his business relations with the society. Hertz then introduced Zekman to other attorneys of good repute who brought suit upon the policy. There is no evidence that Hertz had anything to do with the prosecution of the suit on behalf of the plaintiff; and, while he took part in preparing the defense, it was managed by Silsbee, who alone signed the answer, and who in person made a settlement of the case with plaintiff's attorneys at a conference at which Hertz was not present.

3. The third charge is that Hertz brought several suits against the Yeomen, in 1915, in which he procured another attorney named Kelly, who in fact had nothing to do with the cases, to sign the papers as attorney for the plaintiffs; and that Hertz prosecuted these cases himself and merely used the name of Kelly to enable him to do so without appearing upon the records as an attorney therein. It is also made a part of this charge that Hertz, in bringing these suits, took advantage of information which he had obtained while acting as attorney for the society. These suits were not brought until some two years after Hertz had ceased to be attorney for the society, and there is no evidence that he had obtained any information, while such attorney, which had any bearing upon them. Consequently there is nothing to sustain this last charge. It appears that when these suits were brought Kelly, who was in financial straits, had his desk in Hertz' office, and that Hertz occasionally turned minor matters over to him, but that they were not partners and that each conducted his own business independently of the

other. Hertz prepared the papers in several of these cases and then at his request Kelly signed them as attorney. Hertz had a stenographer, who frequently made out the papers in cases which came into the office, and if he was absent signed his name to them by his authority. After the papers in the first cases against the Yeomen had been made out and signed by Kelly, three other cases came in while Hertz was absent, and the stenographer made out the summons and complaint in these cases, using the forms used in the prior cases, and, Kelly also being absent, she signed his name to them in the belief that she had the right to do so. All these cases were handled exclusively by Hertz and he took all the fees received from them; and the claim that he originally intended to turn them over to Kelly but subsequently concluded to retain them and the proceeds from them to reimburse himself for advances made to Kelly is not very persuasive. However there seems to have been no concealment of the fact that Hertz was prosecuting the cases, and no one seems to have been misled or deceived in respect to his connection with them. In most, if not all of them, he in person, acting as attorney for the claimants, made a settlement with the society which seems to have been satisfactory to all parties concerned. Therefore the only question presented under this third charge is whether his conduct in causing Kelly to appear of record as the attorney by whom these actions were brought and prosecuted, when in fact they were brought and prosecuted by himself, merits disbarment or suspension. While this practice is disapproved, the court is of opinion that where no one has been misled, overreached or prejudiced on account of it, it is not a sufficient ground for taking from an attorney the right to practice his profession.

4. The fourth charge is that Hertz brought a suit in the name of Sophia Gold against the fraternal society known as the Mystic Circle upon a policy issued to her father, Isaac Singer, and payable to her at his death; that Hertz brought this suit without the knowledge or consent of Sophia Gold, and alleged therein that her father had died in 1910, although in fact he is still living, and that Hertz settled this suit with the society for the sum of $500 which he received and appropriated to his own use.

The original mix-up in this case arose from the fact that there were two Isaac Singers, one of whom resided in the city of St. Paul, in still living, and is the father of Sophia Gold, the other of whom resided in the city of Minneapolis and died in 1910 leaving surviving him his widow, Clara Singer.

One Juster, who had been an officer of the local lodge of one or more of the beforementioned societies and who apparently represented a number of policyholders in such societies, gave Hertz several claims upon which to bring suit, among which was the claim of Clara Singer as beneficiary of a policy issued to her deceased husband, Isaac Singer. Hertz, without hav-

ing or seeing the policy but using data furnished by Juster and verified by the secretary of the local lodge, brought suit in the name of Clara Singer against the Mystic Circle, alleging the issuance of the policy to Isaac Singer, his death in 1910, and that Clara Singer, his widow, was the beneficiary in the policy. In its answer the society admitted issuing the policy to Isaac Singer, and also admitted that he had died in 1910 and that Clara Singer was the beneficiary under the policy, but set forth various defenses to the action. Thereafter Hertz and the attorneys for the society made a tentative settlement of the case for the sum of $500 which was reported to the supreme officers of the society for approval. They wrote back to the effect that the settlement would probably be approved, but that their records showed that Sophia Gold, and not Clara Singer, was the beneficiary in the policy, and that this matter must be straightened up before completing the settlement. Thereupon the local attorneys for the society wrote Hertz that they were advised by the society that the beneficiary was not Clara Singer but Sophia Gold, daughter of Isaac Singer, and that it would be necessary to bring suit in the name of Sophia Gold in order that the judgment and settlement might be effective.

Thereafter Hertz brought a new suit in the name of Sophia Gold, and the society interposed an answer setting up various defenses but admitting the issuance of the policy to Isaac Singer and his death in 1910. Subsequently Hertz and the attorneys for the society stipulated for judgment in favor of Sophia Gold and against the society in the sum of $500. Judgment was entered pursuant to this stipulation, the amount thereof was paid to Hertz, and the judgment was satisfied by him. Apparently neither the offcers of the society nor Hertz became aware of the fact that there were two Isaac Singers, one of whom was still living, until some time later.

After learning that the policy in favor of Mrs. Gold had been issued to an Isaac Singer who was still living and that Mrs. Gold claimed that the suit in her name was brought without her knowledge, the society brought suit in the district court of Ramsey county against Hertz to recover treble damages under the statute, on the ground that he had brought suit in the name of Mrs. Gold, without authority, for the purpose of defrauding the society. This suit was tried in the district court and decided in favor of Hertz, the court finding as a fact that he had been authorized by Mrs. Gold to bring the former suit and had settled with her for the proceeds thereof. These findings, of course, are not binding upon this court in the present proceedings, but the record in that case is made a part of the record here, and the evidence is substantially the same in both.

The evidence is radically conflicting. Mrs. Gold testified that she never authorized the bringing of the former suit, never had any communication with Hertz in reference to bringing it, and did not know that it had been

brought until so informed by an attorney for one of the societies after the case had been settled; and she is corroborated in several respects by other evidence. On the other hand, Hertz testified that he made an express agreement with her to bring the suit, and as to the application to be made of the proceeds, and he is corroborated in material respects by other apparently disinterested testimony. Mrs. Gold also testified that she made a settlement with Hertz, on May 14, 1916, for money collected by him upon a policy issued by another society to a relative by the name of Merriamson and was paid by check, and further testified that she never made any settlement with Hertz for the money collected from the Mystic Circle and never had any conversation with him at any time concerning it. Hertz testified that on May 14, 1916, at the conference mentioned by Mrs. Gold, he made a settlement with her, not for the Merriamson case, but for the money collected from the Mystic Circle, and corroborated his testimony by producing a canceled check, dated on that day, which had been indorsed and cashed by Mrs. Gold, and which recited upon its face, "in full settlement * * * of all claims and demands to date in case against Fraternal Mystic Circle." No attempt seems to have been made, either in this proceeding or in the suit brought by the society, to lessen the force and effect of this recital as a contradiction of Mrs. Gold. The district court, in the case in that court, gave much weight to this check as establishing that her testimony was unreliable, and we find no sufficient reason for disagreeing with the conclusions reached by that court. That the Isaac Singer who died in 1910 had a policy in one or more of the societies is not disputed, but whether he had a policy in the Mystic Circle is not made clear. However this may be, it seems reasonably certain that Hertz as well as the society believed that he was the person to whom the policy in question had been issued, and did not learn otherwise at any time during the pendency of the suit.

After examining the entire record we are unable to say that the fourth charge is sustained by the evidence.

5. The fifth charge is an omnibus charge to the effect that Hertz had collected money from various societies and failed to account for it to his clients. Three cases were investigated under this charge and it is conceded that the evidence shows no misconduct in two of them. In the third the only misconduct claimed is that Hertz collected the money and retained it a considerable time without notifying his client. The client testified that when he learned that the money had been collected he went to Hertz and that Hertz immediately paid the money over to him. Instead of making any complaint, he seems to be well satisfied with the services and treatment given him, and testified that Hertz is still his attorney and is now handling two other cases for him.

This court will not overlook or condone misconduct on the part of at-

torneys, but taking from an attorney the right to earn his livelihood in the practice of his profession, after he has spent years preparing himself to do so, is of such serious consequence to him that the charges must be supported by a clear preponderance of the evidence in order to justify disbarment. 2 Enc. Ev. 138; State Board of Examiners in Law v. Dodge, 93 Minn. 160, 171, 100 N. W. 684.

The court is of opinion that the charges contained in the accusation have not been established by sufficient reliable proof and the proceeding is dismissed.