# IN RE DISBARMENT OF JOHN D. GREATHOUSE.[1]

May 5, 1933.

No. 29,155.

*Oscar G. Haugland, Charles E. Houston,* and *McNeil V. Seymour,* for state board of law examiners.

*F. M. Miner, Thomas W. McMeekin, Samuel P. Halpern,* and *William A. Tautges,* for respondent.

*PER CURIAM.*

The state board of law examiners filed an accusation against John D. Greathouse asking for his disbarment or discipline because of his alleged unethical solicitation of business. The Honorable Julius J. Olson, one of the judges of the fourteenth judicial district, was appointed to take the evidence and make findings of fact, which are adopted by us.

John D. Greathouse was admitted to practice law in this state in 1919 and has since been engaged in his professional work, with his office in the city of Minneapolis. He has specialized in the procuring and prosecution of damage suits on account of personal injuries and property damages suffered, most of which causes of action

[1]Reported in 248 N. W. 735.

52

arose out of automobile accidents. In 1927, 1928, and 1929 respondent employed laymen who solicited his employment in personal injury litigation. This apparently ceased upon the enactment of L. 1929, p. 360, c. 289, Mason Minn. St. 1931 Supp. §§ 5687-5 to 5687-9, which makes it unlawful for an attorney to employ any person who is not an attorney to solicit claims for personal injury or death.

Since January 1, 1930, respondent has employed four or five different attorneys who devoted a considerable portion of their time to the solicitation of business for him. Some worked on a salary and some on contingent fees. He furnished them the use of his library, office equipment, stenographic and telephone service, and office supplies. Each of these attorneys practiced his profession in his own name and for his own benefit, excepting only that each agreed with respondent that he would handle no damage cases in his own name or for his own benefit, but that all cases arising out of tort, especially automobile cases, should be solicited and procured for respondent, who would pay to the employed attorney procuring the particular case one-third of such fee as the respondent would otherwise realize. Such employed attorneys agreed diligently to seek and procure professional employment for respondent in damage cases, and were to solicit such employment for respondent from persons having such claims. Respondent himself actively solicited his own employment in like cases. Respondent negotiated many settlements. The principal activity of the organization was to get business, and there was an organized system to that end.

Respondent maintained a rather aggressive organization for procuring such business. Arrangements existed in his office whereby "tips" or "leads" would come to the office from public garages, newspaper reporters, and sometimes from former clients, of the happening of accidents. Upon the receipt of such information respondent would go himself or detail one of the employed attorneys to the hospital or other place to find the injured person or persons.

Early morning newspapers were read to learn of automobile accidents. Sometimes the machine or organization operating through

newspaper employes disclosed the desired information before the newspaper was off the press, and the solicitor was on his way in advance of others engaged in similar solicitation for someone else; or possibly in advance of the adjuster for some insurance company. In several such instances the newspaper reporters were rewarded by the payment of $10 to $15. Respondent and those employed by him always carried with them ready for use printed forms of contract for employment. Sometimes they carried, and used in argument in selling respondent's services, photostatic copies of checks issued in settlement or payment in former cases. They also carried and used newspaper clippings reporting recoveries of large sums of money in other cases handled by respondent.

Respondent and his associates, in their transactions with injured persons, to a very great extent dealt with people who had very little knowledge as to the ethics of the legal profession. Contracts were sometimes made with relatives of the injured persons and were at times made when an injured person was unconscious.

The employment contract provided for a contingent compensation of 25 to 40 per cent. The customary compensation was one-third of the amount recovered, first deducting necessary expenses. During the last three , and one-half years respondent's professional business along the lines indicated has been very extensive. He tried few cases himself, and usually arranged with other attorneys to try cases for him, paying them from his fee. He employed able attorneys.

Counsel treated his clients with fidelity, and as a rule they were satisfied with the service he rendered them. It is not claimed in this case that he is guilty of any dishonesty. The sole question presented by the record for our determination is whether or not such an organized system of solicitation for professional employment in the manner and form stated calls for discipline because of being unethical or unprofessional conduct.

An attorney is not an officer of the state in a constitutional or statutory sense of that term, but he is an officer of the court, exercising a privilege during good behavior. This privilege is granted

by the court in the exercise of judicial power, not as a mere ministerial power. Ex parte Garland, 4 Wall. 333, 18 L. ed. 366; Hanson v. Grattan, 84 Kan. 843, 115 P. 646, 34 L.R.A.(N.S.) 240; 6 C. J. p. 571, § 16.

In Ex parte Garland, 4 Wall. 333, 378, 18 L. ed. 366, it is stated that attorneys "are officers of the court, admitted as such by its order, upon evidence of their possessing sufficient legal learning and fair private character." It is also there stated that upon admission the lawyers "become officers of the court, and are responsible to it for professional misconduct."

In Ex parte Bradley, 7 Wall. 364, 374, 19 L. ed. 214, the court said:

"We do not doubt the power of the court to punish attorneys as officers of the same, for misbehavior in the practice of the profession."

In Randall v. Brigham, 7 Wall. 523, 540, 19 L. ed. 285, the court said:

"The authority of the court over its attorneys and counsellors is of the highest importance. They constitute a profession essential to society. Their aid is required not merely to represent suitors before the courts, but in the more difficult transactions of private life. The highest interests are placed in their hands, and confided to their management. The confidence which they receive and the responsibilities which they are obliged to assume demand not only ability of a high order, but the strictest integrity. The authority which the courts hold over them, and the qualifications required for their admission, are intended to secure those qualities."

Hence their conduct should command public confidence.

The power to admit applicants to practice law is judicial and not legislative, and is of course vested in the courts only. Originally the courts alone determined the qualifications of candidates for admission; but, to avoid friction between the departments of government, the courts of this and other states have generously acquiesced in all reasonable provisions relating to qualifications enacted by

the legislatures. Hanson v. Grattan, 84 Kan. 843, 115 P. 646, 34 L.R.A. (N.S.) 240; State v. Cannon, 196 Wis. 534, 221 N. W. 603.

The judicial power of this court has its origin in the constitution; but when the court came into existence it came with inherent powers. Such power is the right to protect itself, to enable it to administer justice whether any previous form of remedy has been granted or not. This same power authorizes the making of rules of practice.

The privilege given to an attorney, authorizing him to practice his profession, is always subject to revocation for cause. It is well settled that a court which is authorized to admit attorneys has inherent jurisdiction to suspend or disbar them. This inherent power of the court cannot be defeated by the legislative or executive department. The removal or disbarment of an attorney is a judicial act. Randall v. Brigham, 7 Wall. 523, 535, 19 L. ed. 285; Ex parte Garland, 4 Wall. 333, 18 L. ed. 366. In Ex parte Secombe, 19 How. 9, 15 L. ed. 565, the court recognized common law grounds for disbarment.

Primarily the right to discipline an attorney is directly aimed at the want of fidelity to client, but the principle involved is more far-reaching.

In recent years much has been said about lawyers' solicitation of business. In a report of Dean Fraser of the law school of the University of Minnesota for the biennium 1930-1932 it was stated:

"The practice of 'ambulance chasing' grows increasingly common. There is necessity of making business, or of anticipating others in securing it. Lawyers with scruples against the practice are forced to engage in it in self-preservation. The unseemly scramble lowers the tone of the profession. Lawyers who indulge in these practices lose their own self-respect, undermine public confidence in their profession, and bring disrepute upon the administration of the law."

Traditionally, it has been generally understood by the profession and the public that an attorney cannot with propriety advertise his talent, skill, and ability as merchants advertise their wares, much less call for business like a chimney-sweeper. In Ingersoll v. Coal

Creek Coal Co. 117 Tenn. 263, 98 S. W. 178, 9 L.R.A. (N.S.) 282, 119 A. S. R. 1003, 10 Ann. Cas. 829, it was held that a firm of attorneys was not entitled to recover fees for services where it appeared that the case had been obtained by personal solicitation of the clients through a representative. This court has not gone so far, and the case is cited merely to show the attitude of other courts.

Some general remarks have heretofore been made by this court relative to an attorney's soliciting business. Gammons v. Johnson, 76 Minn. 76, 78 N. W. 1035; Johnson v. G. N. Ry. Co. 128 Minn. 365, 151 N. W. 125, L. R. A. 1917B, 1140; Holloway v. Dickinson, 137 Minn. 410, 163 N. W. 791; Anker v. C. G. W. R. Co. 140 Minn. 63, 167 N. W. 278. But these cases do not reach the question now before us. While Mr. Justice Bunn's language in Johnson v. G. N. Ry. Co. 128 Minn. 365, 151 N. W. 125, L. R. A. 1917B, 1140, seems in conflict with the Tennessee court, he was discussing the contractual rights between the parties, and what he said is not applicable or appropriate to a discussion of ethical conduct on the part of an attorney arising out of the solicitation of business. We do not construe any of these previous utterances of this court as approving the practice here involved. We are free to act as our judgment dictates.

In People v. Berezniak, 292 Ill. 305, 315, 127 N. E. 36, 39, the court said:

"The grant of a license to practice law is on the implied understanding that the party receiving it shall in all things demean himself in a proper manner and that he will abstain from such practices as cannot fail to bring discredit upon his profession or upon the courts."

In In re Schwarz, 231 N. Y. 642, 644, 132 N. E. 921, 922, a lawyer was disbarred for solicitation. This, however, was under statutory authority. We recognize that expressions in a dissenting or concurring opinion are not authority and are important only as expressions of a jurist and must stand or fall as follows from their inherently sound logic or reason. We quote here from Pound, J. (dissenting), which amounts only to the views of an able jurist:

"The profession has ever discountenanced as undignified and indecorous the conduct of the lawyer who blatantly advertises for business as those engaged in trade may do without exciting unfavorable criticism. Attorneys are officers belonging to the courts and subject to their control and discipline. (Matter of Cooper, 22 N. Y. 67.) Advertising or soliciting business is censurable as a form of self-laudation unbecoming the traditions of a high calling. The canon thus incorporates in the Code of Ethics an ideal standard of conduct which has been long and well recognized and upheld in theory both by bench and bar. The attorney who disregards the rule is properly subject to rebuke if not to disbarment. But the right to practice law is a substantial right not to be taken away except for substantial reasons. Disbarment not only deprives the attorney of his livelihood, but casts him out a pariah in the community. That each deviation from the canons calls for the exclusion of the offender from the select fellowship of the bar is probably not seriously contended by any one. Professional ethics as a code of moral or legal right to be enforced by the courts by the harsh penalty of disbarment can be nothing more than a system of principles of upright conduct and good character. Rules included therein which do not involve the distinction between natural right and wrong should not be too strictly applied against one whose sin has been against good taste rather than good morals."

The Schwarz case, 231 N. Y. 642, 132 N. E. 921, was affirmed upon the opinion in the lower court, 175 App. Div. 335, 342, 161 N. Y. S. 1079, 1083, wherein the court in part said:

"Unless the ancient and honorable profession of the law, whose practitioners are officers of the court of the highest fiduciary character, under obligations of service to the State, to the community and to the court, is to be degraded to the rank of a quack medicine business enterprise, the advertising and business solicitation methods here under review must be emphatically and absolutely condemned."

In In re Gondelman, 225 App. Div. 462, 466, 233 N. Y. S. 343, 346, the court said:

"The testimony demonstrates very clearly the evils of the system of ambulance chasing. Competition between 'ambulance chasers,' and between 'ambulance chasers' and attorneys, in procuring cases, visits to homes and hospitals to procure retainers at unseemly hours and when the injured person or the members of his family were in no mental condition to enter into contracts for the engagement of lawyer's services, division of fees with solicitors and procurers, payment of moneys to officials, doctors and others for help in procuring cases, the use of photographs of checks of amounts of recoveries had and newspaper clippings showing successes in court for the purpose of procuring clients, are all laid bare. It may be that payments to police officers for recommending cases, and to doctors in hospitals for advising of cases there of persons who had been injured in accidents, are not violations of section 274, subdivision 2, of the Penal Law, but it is conduct which is destructive of the high standards of the bar and is contrary to the Canons of Ethics."

This court has the inherent power to disbar, for sufficient cause shown, any attorney authorized to practice in Minnesota. We are not confined or limited to the particular statutory grounds for disbarment. In support of this statement we quote from State v. Cannon, 196 Wis. 534, 538, 221 N. W. 603, 604:

"Upon the challenge here made to the jurisdiction of this court to disbar attorneys in the exercise of original jurisdiction, we have closely examined the power of this court in that respect which was assumed in the other cases. We conclude that the power in the other cases was properly exercised and that it cannot be challenged here. It is not a power derived from the constitution or the statutes of this state. It is a power which is inherent in this court. It is a power that inheres because attorneys at law are officers of the court. As such they are privileged to invoke the jurisdiction of the court. In certain instances they have control over the writs of the court. They are responsible in no small degree for the quality of justice administered by the courts. They stand in a relation of trust and confidence to the courts. Every court must have a bar. It is a

necessary adjunct of a court. It is the function of the bar to render assistance to the courts in administering exact justice and not to frustrate the courts in the accomplishment of this high purpose. A court must in no small degree rely upon its bar. The bar should be composed of those possessed of learning, character, probity, and honesty. Under our form of government, where the judicial constitutes an independent branch, the character of those who stand in this relation to the court should be of the court's choosing and under the supervision of the court, and other branches of the government should not be permitted to embarrass or frustrate judicial functions by the intrusion of incompetent or improper officers upon the courts. Courts will defer to reasonable legislative regulation, but this deference is one of comity or courtesy rather than an acknowledgment of power. This view is without doubt supported by the great weight of authority.

"There are no statutes regulating the subject of disbarment in certain states. In such states courts have proceeded to exercise the power of disbarment and to invent their own procedure. Ex parte Cashin, 128 Miss. 224, 90 South. 850; Lenihan v. Comm. 165 Ky. 93, 176 S. W. 948, L. R. A. 1917B, 1132. In so proceeding they acted under their inherent power and did not deem it necessary that jurisdiction in such behalf should be conferred by statute or constitutional provision.

"* * * Prior to legislative action, our courts acted under their inherent power to disbar. The fact that since such legislation they have deferred to the practice prescribed by the legislature should cast no doubt upon their inherent power in the premises.

"Among the great number of cases holding it to be an inherent power of courts to admit and disbar attorneys, merely deferring to statutory regulations on the subject, we content ourselves with citing the following: Ex parte Secombe, 19 How. 9, 15 L. ed. 565; Ex parte Garland, 4 Wall. 333, 18 L. ed. 366; Randall v. Brigham, 7 Wall. 523, 19 L. ed. 285; Hertz v. U. S. (C. C. A.) 18 F. (2d) 52; Danforth v. Egan, 23 S. D. 43, 119 N. W. 1021, 139 A. S. R. 1030, 20 Ann. Cas. 418; Hanson v. Grattan, 84 Kan. 843, 115 P. 646, 34

L.R.A.(N.S.) 240; In re Day, 181 Ill. 73, 54 N. E. 646, 50 L. R. A. 519; In re Bruen, 102 Wash. 472, 172 P. 1152.

"It follows from what has been said that the statute confers no jurisdiction upon this court to entertain the present proceeding. That jurisdiction inheres in the court. It exists by virtue of the fact that this is a court, and the power sprang into being independent of any written law when the court was created."

See also Anno. 73 A. L. R. 401; 6 C. J. p. 598, § 58; Ingersoll v. Coal Creek Coal Co. 117 Tenn. 263, 98 S. W. 178, 9 L.R.A.(N.S.) 282, 296, 119 A. S. R. 1003, 10 Ann. Cas. 829; People ex rel. Maupin v. MacCabe, 18 Colo. 186, 32 P. 280, 19 L. R. A. 231, 36 A. S. R. 270; 3 Am. & Eng. Enc. of Law (2 ed.) 301.

In In re Woolley, 11 Bush, 95, 111, the court said:

"The right of self-preservation is an inherent right in the courts. It is not derived from the legislature, and can not be made to depend upon legislative will."

Even where there is a statutory authority to admit an attorney to practice, the court has an inherent right to see that the privilege is not abused and the attorney is in duty bound to abstain from conduct which will bring discredit upon himself and the courts; he must not bring reproach upon the profession. People ex rel. Moses v. Goodrich, 79 Ill. 148.

This court is charged with the responsibility of disciplining attorneys doing acts tending to bring reproach upon the legal profession, whose members are officers of the court. The court cannot maintain appropriate respect and command that degree of public confidence necessary for the proper administration of justice and tolerate conduct on the part of members of the bar which tends toward the deterioration of public confidence and respect. The principal purpose of disbarring attorneys is for the protection of the public and to maintain a standard of administration of justice that will at all times inspire such confidence and respect. The court has the power to discipline attorneys on the grounds of self-protection, outside of the common law and outside of the statutory

law, in cases where they have so conducted themselves as to impair the administration of justice. Weeks, Attorneys at Law, § 80. This power is possessed by all courts which have authority to admit attorneys to practice. Id.

We have before us a pure question of professional ethics, which relates to ideal conduct. A lawyer is ethical when he is in the right place, fulfilling appropriate professional functions. The argument of respondent's counsel is that ethics means no more than honesty, and that if a lawyer is honest with his clients his conduct is necessarily ethical. With this we do not agree. The most ethical is one who is realistically simple therein. Ethics means that conduct which is correct, fit, and which works best to the best results. Lawyers above all others should know and appreciate the realities of life. One who is admitted to practice law must do more than receive—he must give. He must contribute to the ideals of the profession. If he does not appreciate the sense of duty for his own sake, we must impress it upon him for the sake of others in the profession and also for the public welfare, because otherwise the courts cannot administer complete justice. Equality of opportunity in the profession is more nearly obtained when ethical conduct prevails therein.

There have been other law office organizations in the larger cities of the state which have and perhaps are conducting their business along similar lines. Such conduct of a law business is a menace to the ordinary ethical practitioner, and especially the country lawyer, who is usually the least offender. The lawyer agents of such soliciting system as here involved invade the remote sections of the state and sell their employer's services in the territory which geographically belongs to local attorneys. Such conduct violates the elementary standards of fair play. A continuation and approval of such conduct dooms the destiny of the legal profession. Such conduct also leads to underbidding. It can be met only by the solicitation of other attorneys. Solicitation of the type here involved is undignified and unprofessional in the solicitor and tends to provoke similar conduct in other members of the profession and to destroy

in the eye of the public the ideal standards of the bar as an arm of the law.

No moral turpitude is here involved. Respondent has adopted methods in his professional conduct which cannot have our approval. We cannot condone his conduct. He not only engaged in solicitation himself, but he controls an organized system of solicitation. This case is important, not so much on account of respondent, but as a corrective influence. Respondent has not injured his clients; but he is an officer of the court, and has by such conduct brought the profession into disrepute, and is engaged in a practice which if permitted will naturally degrade the legal profession and lead to abuses. Such conduct as here disclosed by the record is incompatible with that degree of dignified conduct essential to command the public confidence and respect, which we regard as necessary for the proper and complete administration of justice. Lawyers must not lose their great power for good.

On March 19, 1931, the Minnesota State Bar Association filed with this court a petition for the adoption of rules governing the practice of attorneys. The proposed rules prohibited the solicitation of professional employment. We did not then consider it necessary to adopt the proposed rules, and in an order filed May 17, 1932, denying the application, it was said:

"The canons of professional ethics of the American Bar Association characterize solicitation of business on the part of a lawyer as unprofessional.

"In Minnesota the bar generally recognizes the controlling force as standards of professional ethics of the canons adopted by the American Bar Association. It is our conception that, without any further rules by this court, any lawyer who may indulge in unethical solicitation of business is subject to discipline at our hands under the usual procedure."

Canons Nos. 27 and 28 of the American Bar Association condemn all solicitation for business, not warranted by personal relations, and term it as "unprofessional." These canons also disapprove and say that it is disreputable to hunt up causes of action and inform

thereof in order to be employed to bring suit, or to breed litigation by seeking out those with claims for personal injuries in order to secure them as clients, or to employ agents or runners for that purpose.

It is our understanding that the Minnesota State Bar Association has adopted the canons of the American Bar Association. Of course these canons do not have the binding force of a statute, but they do afford a very commendable guide for professional conduct.

Counsel for respondent claims great credit for the service of the soliciting lawyers and points to the service which they have rendered. But this argument is fallacious in that it is apparently based upon the erroneous assumption that the injured persons would never have employed a lawyer had the solicitor not called on them.

An effort is also made to make it appear that the soliciting lawyer is a public benefactor because he may beat some insurance adjuster to the injured person. If such adjuster is a public menace, we may presume that the legislature will take any necessary action. It seems to have had the adjuster in mind when it enacted L. 1929, p. 360, c. 289, § 4, Mason Minn. St. 1931 Supp. § 5687-8. Anyway, his misconduct, if there be such, does not justify a lower standard for the bar. One wrong seldom justifies another. Our duty requires us to meet our own responsibility.

For us to approve such a system of solicitation would be an invitation for others, who so far have been restrained by a sense of propriety from joining in the undignified if not disgraceful race for business; the result in the administration of justice would be as if one arm of the court were paralyzed. The social health of the judiciary cannot permit a continuation of respondent's systemized business. We are, however, disposed to exercise indulgence toward counsel. The record does not attach to him fraud, nor does it show that he indulged in the conduct of some soliciting lawyers who falsely represent that the injured person requires a specialist to handle an ordinary personal injury action and that local lawyers are incompetent therefor.

It seems to us that we should not deal harshly with a lawyer who does only what other lawyers have been doing unmolested. We believe, however, that during the past three years the coming of our present holding has been ominous and has disturbed the soothing narcotic of success on the part of the soliciting lawyers. Yet we hope to do no injustice to anyone. We have here considered an organized system of solicitation, and any lawyer indulging in such in the future should do so with the expectation of disbarment.

In Ex parte Burr, 9 Wheat. 529, 530, 6 L. ed. 152, Chief Justice Marshall said:

"On one hand, the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise. The right to exercise it ought not to be lightly or capriciously taken from him. On the other, it is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved. For these objects, some controlling power, some discretion, ought to reside in the court. This discretion ought to be exercised with great moderation and judgment; but it must be exercised; and no other tribunal can decide, in a case of removal from the bar, with the same means of information as the court itself."

We must exercise a sound judicial discretion. What we are concerned with is that an attorney does not indulge in such conduct as will bring upon himself, the bar, or the courts the public odium. The judiciary must make itself worthy of public confidence. We expect any person found morally fit to be admitted to practice law to have and to exercise a keen sense of propriety; and a selfish interest, if nothing else, ought to make coöperation both desirable and attractive. It would be better for all.

We are of the opinion that, under the circumstances of this case, the proper disposition of these proceedings is to express our emphatic disapproval of respondent's organized system and methods of solicitation and severely censure him therefor. Upon his refraining from further practice of such conduct no further action

will be taken. If he does not abstain therefrom the state board of law examiners may apply for judgment of disbarment. We will for the present retain jurisdiction.

*STONE, Justice* (dissenting from the result).

I concur in the theory of the decision and its general treatment of the issue. I consider the power to discipline an attorney inherent in this court simply because it is part of the judicial power of sovereignty delegated to the courts by the constitution. Because, in my judgment, we ourselves have been lax in permitting for so long the practice of avowed, systematic, organized "ambulance chasing" by members of our bar (as to which my views were expressed in concurring in the decision of Winders v. Illinois Cent. R. Co. 177 Minn. 1, 5, 223 N. W. 291, 226 N. W. 213) and because it has been indulged in by so many others than Mr. Greathouse, I agree that he should not now be subjected to the ultimate penalty of disbarment. But I do think we should put upon him the burden of showing that from now on he will avoid the unprofessional and reprehensible practices, and all semblance of the same, which are the basis of this proceeding. My view is that he should stand suspended from practice until he makes such a showing to the satisfaction of the board of law examiners.