## IN RE DISBARMENT OF ROBERT J. McDONALD.[1]

No. 30,755.

December 9, 1938.

[1]Reported in 282 N. W. 677, 284 N. W. 888.

*Charles E. Houston, David L. Morse, R. B. Reavill,* and *Oscar G. Haugland,* for State Board of Law Examiners.

*Mortimer H. Boutelle, Thomas W. McMeekin, Roger Dell, Richard N. Gardner,* and *William H. DeParcq,* for respondent.

PER CURIAM.

In this disciplinary proceeding the court is confronted with a

record of nearly 3,000 typewritten pages, by the findings of the referee of 74 printed pages, and briefs of 800 pages. It is not possible in an opinion to deal with this mass of material exhaustively or satisfactorily.

The petitioner, the State Board of Law Examiners, charges the respondent, Robert J. McDonald, licensed to practice law in this state in 1920, of professional misconduct in maintaining a system or organized plan for soliciting personal injury cases arising in this and other states, and therein has employed lawyers and laymen who have been provided with newspaper clippings of accounts of large verdicts secured by respondent for his clients, and photostatic copies of checks and drafts received in settlement of cases and in payment of verdicts or judgments rendered after trials, and, as an inducement to being employed, respondent has advanced to needy clients large sums of money, all contrary to the rules of conduct for lawyers enunciated by this court and contrary to the canons of ethics adopted by the American Bar Association and the Minnesota Bar Association. Neither in the petition nor before the referee was respondent charged with misconduct in court, or with unfairness to opposing counsel, or with sharp practices in the trial or settlement of cases, or with taking any undue advantage of his clients, or with any incompetency or lack of skill or diligence in business intrusted to him. It was unavoidable that the evidence taken and reported upon such a charge should take a wide range. The findings treat each case testified to separately, except where on motion of respondent all the evidence taken was stricken, and then ends up with this paragraph:

"(33) Your referee finds that respondent herein has not solicited professional employment, and is firmly convinced that the charges contained in this petition are wholly without merit and that it should result in a dismissal and a complete exoneration of the respondent."

Before considering the merits of the accusation and the points of law presented, we take occasion to disapprove of the procedure adopted by respondent and his counsel. Each day while petitioner

was adducing its proof respondent, called by petitioner for cross-examination under the statute, was absent. This his counsel announced was advisedly done. Likewise his brother Donald, a layman employed in the office, who secured or attempted to secure for respondent many of the cases herein involved, was absent until respondent offered his proof. When respondent did appear to testify in defense, petitioner was denied the privilege of cross-examining him under the statute and was restricted in its cross-examination to matters testified to on direct. While petitioner was offering its proof, with respondent and his brother absent, it was sometimes very difficult to establish that the one who procured the case for respondent was authorized by him to so do, and the record contains page upon page of technical objections and lengthy arguments, wherein each of the five eminent attorneys who, in behalf of the respondent, took part in the trial was heard. When the testimony was concluded and the referee had ruled on some matters held in reserve, he requested each side to present him with such findings as seemed appropriate, in order to assist him in formulating his. No trace of the contentions of petitioner is discerned in those filed by the referee.

We consider proceedings instituted by the State Board of Law Examiners to discipline attorneys in a different light from an ordinary action at law. It is a proceeding *sui generis*. In Matter of Richards, 333 Mo. 907, 916, 63 S. W. (2d) 672. Attorneys are licensed by the court. The court is charged with the responsibility of revoking or temporarily suspending this license whenever the licensee departs from what is generally considered by the courts and the profession as proper and honorable conduct. The State Board of Law Examiners is a body established by law to aid the court in admitting to practice only those deemed fit, and which has been delegated by the court to investigate complaints of misconduct made against attorneys, to warn and admonish them where misconduct appears, and to bring them before the court when warnings are not heeded. 1 Mason Minn. St. 1927, § 5685. It seems to us that when an attorney is formally accused by the board of wrongdoing he owes it to the court as well as to himself to aid rather

than to thwart a full and fair investigation of the charges. Purposely absenting himself at the hearing so as to escape being called for cross-examination under the statute we regard as indefensible in this proceeding, and shall assume until otherwise convinced by the evidence that those who solicited the cases referred to, in the evidence reported, were authorized by respondent to do what they did in his behalf.

The petitioner challenges the entire findings as being contrary to the great preponderance of the evidence. Respondent contends that the findings, being in his favor, should be sustained if there is any evidence reasonably supporting the same, particularly invoking 2 Mason Minn. St. 1927, § 9319, which provides: "If the reference be to report facts, the report shall have the effect of a special verdict." Distinction is to be made between special findings and special verdicts. 6 Dunnell, Minn. Dig. (2 ed. & Supp.) § 9801. This distinction may not be of much aid here. The referee was appointed in virtue of 1 Mason Minn. St. 1927, § 5697(2), relating to the removal or suspension of attorneys, which provides that a referee so appointed "shall have all the powers of a referee under Section 7823, General Statutes 1913" (§ 9319 present code). Section 5697(2) also provides: "The referee shall report the evidence, and if directed by the Supreme Court shall make findings thereon." This statute does not say what effect is to be given to the findings. Rule 24, however, adopted by this court May 15, 1933, provides that the referee so appointed shall "report the evidence" and "shall make findings of fact which shall be conclusive, unless a case shall be settled in accordance with and within the time limited in 2 Mason Minn. St. 1927, §§ 9328 and 9329." The point of petitioner seems well taken that only where a referee is appointed by virtue of § 9317 his findings of fact have the effect of a special verdict as provided in § 9319. In this proceeding petitioner had a case settled and is in position to assail the findings as being contrary to the evidence.

Upon a careful consideration of the whole record, we are satisfied that the findings and rulings, especially during the introduction of respondent's defense, are such that the court should not adopt or

accept the findings. We consider paragraph 33 thereof, above quoted, which is a summary of the findings relating to the individual cases upon which evidence was received, as manifestly against the weight of the evidence. In that situation the only course to pursue is to vacate the findings as a whole and render our decision upon the evidence offered and reported, considering that which was erroneously stricken or excluded, if written, and included in the settled case as in. In so refusing to accept or adopt the findings of the referee we have precedents. In In re Disbarment of Forbes, 192 Minn. 544, 257 N. W. 329, the findings of the referee were disregarded *in toto*. So were the findings of the first referee in In re Disbarment of Tracy, 197 Minn. 35, 266 N. W. 88, 267 N. W. 142.

In considering and determining an accusation against an attorney we are mindful of what a finding of guilt means to him. It results in the loss of a profession by which he has earned a living for himself and family, and, even if there be but suspension, it seriously affects his professional reputation and impairs his earning capacity. The proof of wrongdoing must therefore be cogent and compelling. State Board of Examiners in Law v. Dodge, 93 Minn. 160, 100 N. W. 684; People v. Hammond, 355 Ill. 581, 191 N. E. 215. During the introduction of the evidence it became apparent that petitioner and respondent regarded the case of In re Disbarment of Greathouse, 189 Minn. 51, 248 N. W. 735, decided in May, 1935, as of great importance, respondent insisting that it condemns organized solicitation only, that it announces a new rule of conduct not theretofore existent in this state, and hence evidence of solicitation prior thereto was inadmissible, and especially solicitation more than two years prior to the institution of this proceeding. Petitioner, while not claiming that respondent should be disciplined for the solicitation prior to the Greathouse decision, insists that evidence of his conduct in that respect from its inception was admissible to prove his attitude and consequent likelihood of indulging in the soliciting practice during the subsequent period. It also claims, and rightly so, that the two-year limitation in § 5697(2) of the Code is not a bar. This last point is so fully sustained by

In re Disbarment of Tracy, *supra,* that no further comment is necessary.

In considering the evidence the court also has had in mind that an attorney may legitimately accept as clients persons attracted by his reputation for success in any branch of the law. And so, where an injured person, through friends or otherwise, learns of an attorney's outstanding ability in the handling of personal injury cases, sends word to such an attorney of a desire to retain him, it cannot be said to be a violation of the canons of ethics, above referred to, if he contacts such injured persons. So viewing the evidence, we find that the Harris cases were obtained without transgressing the canons of ethics, and in the Taube case we find respondent was not sufficiently connected with its solicitation, but that another attorney, sharing the office, had been retained therein.

We think the referee erroneously struck out the evidence taken in the Winterwerber and the Lott cases, and we consider the testimony reported in each. The purposeful absence of respondent and his brother Donald while petitioner was offering its proof prevented better identification of the solicitor than was made. In spite of that, we are satisfied from the methods pursued and the contact with respondent's office that the solicitor was respondent's brother Donald, even though respondent testified that he was then discharged.

We do not propose to discuss each of the seven cases arising out of accidents prior to the Greathouse decision, nor each of those arising out of the 11 accidents that occurred since, to which the evidence taken and reported relates; but merely to indicate the basis for the conclusion reached.

From the time of his admission in 1920 respondent has made a specialty of the litigation and settlement of personal injury cases and has obtained an enviable reputation of success therein. In 1926 he joined a firm that also had attained eminence in that branch of the law. In C. M. St. P. & P. R. Co. v. Wolf, 199 Wis. 278, 226 N. W. 297, respondent testified as to the organized solicitation of his firm for this sort of cases. Pointedly the Wisconsin court called the situation to the attention of the authorities of this state. The

Wolf case was decided in 1929, and it therefrom appears that in his testimony respondent thus refers to Chunes v. D. W. & P. Ry. Co. 298 F. 964, where Judge McGee stated that respondent had admitted that he indulged in the practice of "ambulance chasing" [199 Wis. 284]:

" 'I told Judge McGee, while he was on the bench, that the case before him was not solicited; and even if it was solicited it was none of his business, until they changed the law in Minnesota. And it did not appear in the 298th and no court reporter was there to take what was said down, and I am sorry there was not some one there. I have not changed our method of practice since that took place in the federal court. I will tell you this: when I was admitted and first started in this business, I thought it would be all right to solicit cases. I told you that the other day. And because of the decision of the Minnesota supreme court saying that a lawyer has a perfect right to solicit cases, when I started in I told everybody I was practicing law; I didn't just put a sign up and stay there and wait for somebody to come in; I will admit that.' "

This recital of respondent's testimony in the Wolf decision must be accepted as authentic, and connects him with the Chunes case (298 F. 964), determined in 1924, and proves that respondent had a fixed conviction, at least up to the Greathouse decision, that systematic solicitation of personal injury cases was a legal right of which an attorney could not be deprived. The board of law examiners as early as 1930 informed respondent and the firm of which he was a member that complaints had been received of their soliciting cases. In 1934 the matter was taken up by the board with respondent; in fact, the Kensler case was considered. Later there was a meeting in St. Paul, attended by respondent, members of the board, and the chairman of the ethics committee of the state bar association, and the situation discussed. Pursuant to an understanding then arrived at, he wrote a letter explaining how he obtained certain cases discussed at the conference. In a long letter to the board on June 14, 1934, respondent expressed the opinion that the Greathouse decision was directed only against organized solicitation and that

the American Bar Association's canons of ethics were not binding. He finally conformed to the request of the board that he discharge Donald and change his relations with attorneys sharing his office. But, all this notwithstanding, we find that even after this proceeding was begun the same sort of solicitation by persons provided with photostatic copies of checks and newspaper clippings was going on (Winterwerber case). As already intimated in the alleged systematic or planned solicitation of cases, the agent or solicitor usually appeared armed with photostatic copies of large checks received in cases tried or settled by respondent and newspaper clippings of cases handled by him, and a short form of contract engaging respondent as attorney. Respondent designated Donald and others employed as investigators of the accidents involved; but it is noticed that their chief objective was the securing of the signature of the injured person to the contract employing respondent. In respect to this alleged solicitation, the evidence generally came from satisfied clients, with very few exceptions. So that the testimony did not come from those who might wish to harm respondent. In three cases some features should be adverted to.

In the so-called Marshall or Champeny case of Milwaukee in 1934, word came to respondent of Mrs. Marshall's desire for an attorney, she being in a hospital in Milwaukee, injured in an accident in which her husband was killed. Respondent telegraphed Leak, a lawyer in his employ, who was then in Milwaukee, to see Mrs. Marshall. He did so, exhibited the photostatic copies of checks and newspaper clippings, solicited the employment of respondent, and suggested the moving of Mrs. Marshall to some Minneapolis hospital, where a spine specialist could attend her. Mrs. Marshall was not aware of any spine injury. He failed to obtain the employment of respondent. The same effort was made here as in the Krueger and Samuels cases to induce the owner of the cause of action to come to Minneapolis. The Krueger case is one where, in December, 1933, a freight train was derailed in the state of Washington and the train crew of four men were killed. This man Leak, who solicited Mrs. Marshall's case, was sent by respondent to secure the case Mrs. Krueger had against the railway company for the death of her hus-

band. The same method used by Leak in the Marshall case was used persistently but unsuccessfully, including an offer of transportation of Mrs. Krueger to Minnesota to see respondent. Flannery, who notified respondent of the accident, at one time was a solicitor for respondent's firm. He accompanied Leak each of the four or five times Mrs. Krueger was visited.

One Frank Samuels, a member of a railroad section crew, was injured August 9, 1935, at Edgemont, South Dakota. Soon thereafter he was removed to a hospital in Alliance, Nebraska. His foreman, Mr. Steele, wrote respondent September 20, 1935, that Samuels needed a good lawyer. Respondent sent word to Mr. DeParcq and Donald, who were in Nebraska taking depositions, to get in touch with Samuels. They did so some few days later and interviewed Samuels, but no effort was made to secure the employment of respondent. DeParcq testified that Samuels was anxious to get away from that hospital and desired then to be taken to Minneapolis; that he was advised to remain there because of his condition, but that he could write respondent when he could come; and that DeParcq promised to keep in touch with him. Not until March 15, 1936, did Samuels hear from respondent, when an attorney, Olson, was sent to bring Samuels to Minneapolis. Olson appeared dressed in overalls and leather coat. After considerable maneuvering, Samuels was taken from the hospital and to the train. On the train Olson went through the customary plan of advertising respondent by the exhibition of checks and newspaper clippings and obtained from Samuels a contract employing respondent. There was no communication between respondent and Samuels from the time of DeParcq's call at the Alliance hospital in the latter part of September until Olson's appearance in the middle of March following. This case presents as cogent proof of systematic solicitation as any of those above mentioned occurring prior to the Greathouse decision. In nearly every one of the 18 separate accidents resulting in personal injury claims of which testimony was offered there are indications of the same systematic solicitation, and there seems to be no essential difference between those before and those after the Greathouse decision. It might be said that the testimony

in the Terbay and Simon cases is felt to be not reliable enough to influence or affect our decision. It may also be noted that the systematic plan of solicitation was so ingrained in certain employes of respondent that it was resorted to even when not needed, as in the Keuseman case. We may also say that respondent's testimony that he never authorized the use of photostatic copies of checks or newspaper clippings by his solicitors, only having such for his own use to impress claim agents with what he could secure from juries, is past belief.

There is no need to express our stand on the subject of systematic solicitation by an attorney of professional business in view of the Greathouse and Tracy decisions. While no statute expressly prohibits solicitation by an attorney of professional business, the canons of ethics above referred to, adopted by the American Bar Association and the State Bar Association, condemn the practice. To be sure, these canons are not binding on this court, but, being the expression of the views of the profession, great weight should be given the same. An isolated case obtained by the attorney by personal contact with the client, or at the request of the client's friends, should not lead to disciplinary efforts. But it is quite another matter where through hired investigators of personal injury accidents, or through doctors under obligation to the attorney, or through clients, there is a systematic plan to contact injured persons and by devious means and inducements to obtain a contract to handle the cases regardless of whether or not another attorney is engaged or is on the point of being engaged. Respondent calls attention to numerous cases, of which the most favorable to him is People v. McCallum, 341 Ill. 578, 173 N. E. 827. However, three justices dissented, and the majority opinion strongly condemns solicitation of cases. In Chreste v. Commonwealth, 171 Ky. 77, 186 S. W. 919, Ann. Cas. 1918E, 122, also relied on, it is to be noted that the disbarment was reversed and a new trial awarded because of palpable error by the trial court. There is no encouragement for solicitation found in the decision, but quite the contrary. Cases are cited to the effect that laches, in prosecuting stale complaints, is a good defense. No doubt that is true. Had there been no evi-

dence of solicitation since respondent left the old firm or even since the Greathouse decision, there would have been no danger of discipline.

With this record before us of respondent's activity in personal injury cases, his conviction that systematic solicitation of such cases is lawful, and his persistent contentions in that regard with petitioner, it is impossible to escape the conviction that when his clients and those sought as clients testify to the usual devices used by his employes to obtain cases for respondent, they testify to the truth. Hence our finding is that upon the evidence reported respondent has ever since his admission as an attorney indulged in systematic solicitation of personal injury cases; that up to the filing of the Greathouse decision he was firmly convinced of the lawfulness of such solicitations; that since that decision, and in spite of the warnings and advice of the state board of law examiners he has persisted in such practice, merely severing his relations with certain attorneys officing with him and discharging his brother Donald, the chief solicitor, at the request of the board. As conclusion of law respondent is disbarred. After the expiration of three years from entry of judgment and upon presentation of proof that he has in the meantime not directly or indirectly practiced law and that he has paid and satisfied the cost of this proceeding, including reasonable attorneys' fees and the cost of the transcript of the record (State v. Cannon, 199 Wis. 401, 226 N. W. 385), respondent may apply to this court for reinstatement. The cost of the proceeding may be settled on motion as soon as may be.

Let judgment be entered accordingly.

UPON RESPONDENT'S PETITION FOR REHEARING AND PETITIONER'S APPLICATION TO SETTLE COSTS OF PROCEEDING.

On March 31, 1939, the following opinion was filed:

PER CURIAM.

To petitioner's application to have the court determine and fix the amount of the costs of this proceeding respondent should pay as a condition precedent to entertaining an application for reinstatement, respondent filed objections.

No objection is made to any item of the disbursements petitioner claims to have made. The total, $9,172.34, is itemized. Each item has been paid out on vouchers approved by this court. In the decision no personal judgment was directed to be entered against respondent. It is appreciated that no statutory authority is found for taxing costs and disbursements against a respondent in a disbarment proceeding. Petitioner so concedes. But, nevertheless, we think it proper that respondent, if he after the expiration of three years should desire to apply to this court for reinstatement as an attorney, should in justice reimburse petitioner for the moneys necessarily expended in this proceeding. This court is charged with the duty to see that only those qualified to practice law are licensed as attorneys. Disbarment and discipline of attorneys also devolve on this court. Petitioner, the Board of Law Examiners, is established by law charged with duties in the respects mentioned. The legislature appropriates the funds ordinarily needed by petitioner in the performance of its duties. But respondent by persistent continuance in systematic solicitation of personal injury litigation, after such practice had been condemned in the Greathouse (189 Minn. 51, 248 N. W. 735) and Tracy (197 Minn. 35, 266 N. W. 88, 267 N. W. 142) cases, caused great and extraordinary expense to petitioner in this proceeding. He appears to have made the trial of the charge against him as difficult and expensive as possible. And it seems proper that he reimburse the state, or, what is the same thing, the petitioner, for some of this outlay, before he again applies for license to practice law. We are not disposed to deal harshly with respondent, and we fix the amount he must pay petitioner before any application for reinstatement will be entertained at the sum of $7,500.

The petition for a rehearing is denied, and the clerk is directed to enter on April 8, 1939, the judgment of disbarment ordered.