**In the Matter of the Application for the DISCIPLINE OF Norman PERL, an Attorney at Law of the State of Minnesota.**

**No. CX–86–343.**

Supreme Court of Minnesota.

June 19, 1987.

William J. Wernz, Candice M. Hogan, Phillip Nelson, St. Paul, for appellant.

Ronald I. Meshbesher, Jack S. Nordby, Minneapolis, for respondent.

PER CURIAM.

This matter comes before us for the imposition of discipline for respondent's misconduct in solicitation of clients and in representing clients in personal injury claims while having a conflict of interest. The referee recommends a 1-year suspension retroactive to August 4, 1986. We adopt the recommendation.

On January 31, 1986, the Director of the Office of Lawyers Professional Responsibility served a petition for disciplinary action on respondent alleging six counts of professional misconduct: Payment of referral fees to nonlawyers; solicitation of Dalkon Shield personal injury claims; conflict of interest in respondent's relationship with an insurance adjuster; misappropriation of client funds with respect to interest earned in the firm trust account; commingling of funds and inadequate records; and cover-up of misconduct and obstruction of the disciplinary investigation.

In answering the petition, respondent denied any wrongdoing, but also, pursuant to Rules 10(b) and 13(b) of the Rules on Lawyers Professional Responsibility, filed a "conditional admission," under which he offered to admit the charges of misconduct on the condition that the discipline imposed

be not more than 1 year's suspension. On August 1, 1986, after a hearing in this court, we issued an order (two justices dissenting) suspending respondent for 1 year commencing August 4, 1986, with reinstatement dependent on certain terms and conditions. The Director then filed a petition for a rehearing. It appeared that there had been a misunderstanding on the nature of the tendered conditional admission. This court concluded, therefore, that the matter should be thoroughly explored at a full referee's hearing; and on October 6, 1986, we issued an order withdrawing and vacating the suspension order and remanding the case to the referee.[1]

A hearing was held between November 10, 1986, and December 19, 1986, before retired judge Carroll E. Larson as referee. Judge Larson's findings of fact and conclusions of law were filed on January 22, 1987. Neither side has ordered a transcript of the proceedings, and, therefore, the findings and conclusions are deemed conclusive. Minn.R.Law.Prof.Resp. 14(d).

The referee found that three of the six charges had not been proven by the Director and should be dismissed. From the evidence adduced, including a detailed examination of the books and records by a certified public accountant, the referee found that respondent and his firm had kept proper books and records; and that there had been no mismanagement of the trust account, no misappropriation, and no commingling of client funds.[2] The referee

---

1. Our order of October 6, 1986, states:

   At the time this court considered respondent's motion for a 1-year suspension on a conditional admission, the court was under the impression that respondent's tendered disposition was considered to be not "wholly unreasonable," and that the parties were essentially in agreement on the amount of costs and expenses to be reimbursed. It now appears, however, from the submitted affidavits that the parties are more than $200,000 apart on the reimbursement item. Not only is the court not in a position to resolve this disparity, but the Director has filed further information, including a detailed procedural history, which leads us to believe we were not fully apprised of all the facts and circumstances at the time of our decision.

*In re Perl*, 394 N.W.2d 487 (Minn.1986).

2. The Director's allegations of commingling and misappropriation arose out of the law firm's practice, initiated by the firm's bookkeeper, of investing trust funds and other firm funds in repurchase agreements and certificates of deposit. The referee found, however, there was no proof that any client monies were used to purchase these investments; apparently only that portion of trust funds representing the firm's earned fees was invested. The earned fees, of course, should have been withdrawn from the trust account before being invested. The referee found that respondent had been unaware of the initiation of this investment practice and ordered it stopped when he did learn of it.

further found that the allegation of a cover-up and obstruction of the disciplinary proceedings were unproven and "without merit." The referee did find, however, that the first three counts of misconduct had been established by the Director.

On the first count, the referee found that respondent had paid referral fees to non-lawyer employees in violation of DR1-102(A)(2) and DR2-103(B) and (C).[3] On the second count, the referee found respondent, through employees, had solicited clients with Dalkon Shield claims in violation of DR1-102(A)(2), DR2-103(B), (C) and (E).[4] On the third count, the referee found that respondent had conflicting interests, in violation of DR5-101(A), in representing Dalkon Shield clients against Aetna Insurance Company while at the same time retaining Aetna's claims adjuster as a paid consultant to evaluate the firm's FELA cases. The conflict of interest violation, we might note, has been the subject of considerable litigation.[5] Here, the referee found that respondent had ordered consulting fee payments to the adjuster, Willard F. Browne, totaling $42,615; and that during the same period of time, respondent had settled 178 Dalkon Shield cases, many if not most of them, through Browne's efforts. While Browne had been paid substantial FELA consulting fees, the referee found "it was not shown that Browne was paid any amounts by Perl for settling Dalkon Shield cases" and that "[i]t also does not appear that the clients were prejudiced in these settlements." As a consequence of *Rice v. Perl*, 320 N.W.2d 407 (Minn. 1982), the trial court further found that Perl has had to repay large sums to clients in forfeiture of his fees earned on the Dalkon Shield cases.

For the three counts of proven misconduct, the referee recommended a 1-year suspension. In mitigation, the referee noted that the severe fee forfeitures already sustained were both "reparational and admonitory" (quoting *Gilchrist v. Perl*, 387 N.W.2d 412, 416 (Minn.1986)). The referee noted, too, that 7 years of "relentless" and costly litigation have taken their toll on respondent's reputation, his law practice, his financial resources, and his health. The referee found that respondent's prior 35-year unblemished record, his age (61), his civic, professional, religious and charitable contributions, were all factors deserving to be given weight in mitigation. The referee recommended the 1-year suspension be retroactive to August 4, 1986, the date when this court had originally ordered respondent's suspension to begin, the referee stating that since that date respondent has "completely detached himself from all phases of law practice." The referee concluded that a 1-year suspension was "a fair and just disposition," and that the litigation "has been continued to a point of exhaustion and should come to an end."

---

3. "I. In 1978 and 1979, Respondent had knowledge of, encouraged and paid to non-lawyer office employees and investigators for recommending and referring prospective clients to the law firm. A non-lawyer employee was paid one-third of the net fee for said referral. Among them were [naming four office employees].

"II. The office employees were paid relatively small sums for their referrals. However, investigators received large sums. Robert Olson was paid approximately $47,000, and Jerome Johnson approximately $25,000."

4. "I. In the year 1978, Respondent had knowledge of and encouraged solicitation of clients in the law firm through an employee, Orville Heil, by hiring a client, Margaret Hartman, to obtain names, make contacts and solicit clients in the Duluth-Superior area with reference to Dalkon Shield claims.

"II. That Margaret Hartman successfully solicited approximately 37 women who became clients and was paid by the law firm $1,850 at $50 per referral. These referrals resulted in great benefit to the law firm resulting in substantial fees.

"III. Testimony also revealed that in the same manner in December 1975, Richard Theno, an employee of the firm, solicited Edwin J. Stich, who had a personal injury claim, which Respondent successfully settled resulting in fees for the firm of at least $30,000."

5. *See Rice v. Perl*, 320 N.W.2d 407 (Minn.1982); *Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209 (Minn.1984); *Gilchrist v. Perl* and *Klein v. Perl*, 387 N.W.2d 412 (Minn.1986) (consolidated appeal); *see also Browne v. Aetna Casualty & Surety Co.*, 377 N.W.2d 74 (Minn.App. 1985).

The issue before us, then, is what sanction to impose. The referee's recommendation is entitled to great weight but final responsibility for discipline lies with this court. The referee recommends a 1-year suspension retroactive to August 4, 1986. The Director requests a 1-year suspension from the date of this court's final order. Respondent proposes several alternative dispositions, the most severe being suspension for 6 months less 1 day retroactive to August 4, 1986.

## I.

We have few cases involving payment to nonlawyers for soliciting clients. This practice was first condemned, and condemned severely, in a 1933 case, *In re Greathouse*, 189 Minn. 51, 248 N.W. 735 (1933). Attorney Greathouse had obtained tips on auto accidents from public garages, former clients, and newspaper reporters, some of whom were paid for the information. Based on these leads, Greathouse would go himself, or send one of his employee-attorneys, to the hospital or other location to find the injured person and solicit their business. This court warned that any such organized solicitation in the future would warrant suspension, but Greathouse was given only a reprimand because this kind of misconduct had not previously been considered by this court and because "we should not deal harshly with a lawyer who does only what other lawyers have been doing unmolested." *Id.* at 64, 248 N.W. at 740. Five years later, we suspended a lawyer for 3 years (later reduced to about 2 years) for similar organized solicitation. *In re McDonald*, 204 Minn. 61, 282 N.W. 677 (1938); *In re McDonald*, 208 Minn. 330, 294 N.W. 461 (1940). Our research indicates that from the 1930's until the 1980's there have been no significant Minnesota cases on appropriate disciplinary sanctions for client solicitation. (In *In re Rerat*, 232 Minn. 1, 44 N.W.2d 273 (1950), the charge of solicitation was not proven and the issue of appropriate discipline, therefore, was not reached.) In 1981, how-

ever, in *In re Appert and Pyle*, 315 N.W.2d 204, 215 (Minn.1981), in a discussion of lawyer advertising, we again warned:

> Overbearing and intrusive practices such as personal solicitation, direct or indirect, and the giving of value in exchange for a favorable commendation or reference are not permitted.

Subsequently, in *In re Appert*, 363 N.W.2d 301 (Minn.1985), and *In re Pyle*, 363 N.W.2d 303 (Minn.1985), where, among other misconduct, there were fees paid to nonlawyer employees for case referrals, this court, pursuant to stipulations, imposed suspensions of 6 months and 2 years, respectively.

Our new Rules of Professional Conduct, Rule 7.3, clearly provides:

> A lawyer may not solicit professional employment from a prospective client with whom the lawyer has no family or prior professional relationship, by in-person or telephone contact, when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain.

and Rule 7.2(c) states:

> A lawyer shall not give anything of value to a person for recommending the lawyer's services * * *.

In *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), the United States Supreme Court held that a state may constitutionally discipline an attorney for soliciting clients in person under circumstances likely to pose dangers that the state has a right to prevent. If an attorney may not directly solicit clients in person, neither may he or she do so indirectly by use of paid helpers. *Id.* at 464 n. 22, 98 S.Ct. at 1923 n. 22; *see also In re Appert and Pyle.* The prohibition against solicitation is a prophylactic rule, designed to protect against the likelihood of overreaching and undue influence and also against the potential for undesirable intrusions into people's privacy; further, there is the danger in solicitation that the solicitor's pecuniary self-interest may

conflict with the client's best interests. *Ohralik,* 436 U.S. at 461–67, 98 S.Ct. at 1921–24. While solicitation may sometimes serve the useful function of alerting persons to their legal rights,[6] too often, especially in the personal injury field, this reason is no more than a cosmetic used by soliciting attorneys to mask a self-seeking pecuniary interest when approaching injury victims. *Id.*

There is another aspect of solicitation which troubles us. Solicitation is not only an unwarranted imposition on lay persons, it is also an intrusive imposition on other ethical lawyers. Years ago, in *Greathouse,* we quoted from a report by Dean Fraser on the adverse consequences of solicitation: "Lawyers with scruples against the practice [of solicitation and ambulance chasing] are forced to engage in it in self-preservation." *Greathouse,* 189 Minn. at 55, 248 N.W. at 737. While some might argue that the consumer would benefit from unrestricted solicitation, we believe that the resultant "unseemly scramble" (Dean Fraser's phrase) creates an environment where both ethical lawyers and their clients lose, because it corrodes the trust and loyalty inherent in the attorney-client relationship itself. We reaffirm our view that solicitation, whether in person or by hired proxy, is misconduct warranting appropriate discipline.

■ In this case, as respondent points out, his solicitation, unlike the ambulance chasing in *Ohralik,* involved no overreaching, deception or harassment of vulnerable persons. Similarly, while the conflict of interest violation is not to be condoned, it appears that there is no evidence that any client was harmed by respondent's failure to disclose to the client Willard F.

Browne's status in settlement negotiations. Moreover, there has been a substantial forfeiture of fees, with more yet to follow, potentially in excess of $500,000, visited upon respondent. We are satisfied there will be no reoccurrence of any improprieties. Considering these factors, as well as the matters in mitigation mentioned by the referee already referred to, we believe under the facts and circumstances of this case that a 1–year suspension as recommended by the referee is the appropriate discipline.

## II.

■ We also conclude respondent's suspension should be retroactive to August 4, 1986. The Director argues that respondent could have practiced during the past year. But this ignores the realities of the situation. On issuance of our original order of suspension, respondent immediately stopped practicing and divorced himself from his firm; when that order was thereafter rescinded, it was hardly practical for respondent, faced with the uncertainties before him, to restart his practice. The referee found that since August 4, 1986, there has been a de facto suspension which should, in fairness, be recognized here. We agree.

■ Respondent is concerned that under a 1–year suspension he must sell his stock in the professional corporation under the mandate of Minn.Stat. § 319A.12 (1986),[7] which, he says, may have possibly severe adverse tax consequences for him. Whatever may be the interpretation of the 90–day rule—and we do not explore that issue here—it is enough to state that the 90–day rule does not apply in this case of retroactive suspension where, at the time of imposition of the discipline, less than 90 days' suspension remain to be served.

---

**6.** But see Comment to Minn.R.Prof.Conduct 7.3: "[The] potential for abuse inherent in direct solicitation of prospective clients justifies its prohibition, particularly since lawyer advertising permitted under the Rule 7.2 offers an alternative means of communicating necessary information to those who may be in need of legal services."

**7.** Minn.Stat. § 319A.12 (1986) provides in part:
Within 90 days following * * * loss of a license to render professional service, all shares of stock owned by such shareholder * * * shall be transferred to and acquired by the professional corporation or persons qualified to own such shares of stock * * *.

We are advised respondent has settled most of the Dalkon Shield fee forfeiture cases against him. We are also advised that respondent has taken and passed the professional responsibility examination required by Minn.R.Law.Prof.Resp. 18(e). He will also, of course, when applying for reinstatement, have to comply with the requirements of the State Board of Continuing Legal Education. The referee has made no recommendation on costs and disbursements. The Director, while asking for costs and disbursements, has apparently abandoned his claim for "expenses" (*e.g.*, hourly charges for paralegal assistance). We conclude respondent should pay $500 costs as required by Minn.R.Law.Prof. Resp. 24(a) and that each party should be responsible for their own disbursements, each having to some extent prevailed.

It is, therefore, ordered that Norman Perl is suspended from the practice of law in this state for 1 year beginning August 4, 1986; that his reinstatement is conditioned on compliance with continuing legal education requirements and payment of $500 costs.

COYNE, J., took no part in the consideration or decision of this case.